William M. PUCKETT, Plaintiff,

v.

GEORGIA HOMES, INC., Defendant.

Civ. A. No. 73–671.

United States District Court,
D. South Carolina,
Aiken Division.

Jan. 28, 1974.

George B. Snelling, Jr., Aiken, S. C.,
Tony J. Foss, Augusta, Ga., for plaintiff.

Douglas Garvin, Peter J. Neussle
Aiken, S. C., for defendant.

SIMONS, District Judge.

Plaintiff brought this suit to recover statutory damages of $1,000.00, plus attorneys' fees and costs, from the defendant for alleged failure to make proper credit disclosures in connection with plaintiff's purchase from defendant of a used "New Moon" mobile home. Plaintiff alleges that such a failure to disclose was a violation of Title I of the Consumer Credit Protection Act, 15 U.S.C.A. § 1601 et seq. (1973 Supp.), popularly known as the Truth in Lending Act. The matter was tried before me without a jury at Aiken on November 27–28, 1973.

Plaintiff testified that he is a resident of Augusta, Georgia, and a barber by trade. Prior to the transaction complained of, plaintiff owned a mobile home which he was renting to a tenant. When this original mobile home was destroyed by fire, plaintiff negotiated to buy the "New Moon" for the purpose of refurnishing his tenant with a home. He testified that although he bought the second mobile home to replace his rental home which had burned, he intended to eventually live in the replacement himself, though he did not indicate when he planned to carry out this intention. Plaintiff further testified that he does not own a trailer park, that he is not "in the business of renting mobile homes," that he owns no other mobile homes, and that he has never owned more than one at a time.

According to plaintiff, the transaction whereby he purchased this mobile home from defendant at its place of business in North Augusta, South Carolina, was consummated on January 12, 1973, when he signed what he referred to as a "sales contract." The copy of this document which he received was admitted into evidence as Plaintiff's Exhibit 1. It bears defendant's name and address and is titled, "Customer's Purchase Agreement for Mobilehome, Travel-Trailer or Add-A-Room." The document bears plaintiff's signature, but no signature appears in the blank provided for the dealer, and under this blank is

printed, "Not Valid Unless Signed and Accepted by an Officer of the Company." This document is not dated although plaintiff testified that he executed it and received a copy on January 12. Plaintiff also testified that the trailer was delivered by defendant to Key's Trailer Park on January 15.

A printed and executed form entitled "Retail Installment Contract" was admitted into evidence as Plaintiff's Exhibit 3. Typed-in blanks on this document list plaintiff as buyer and defendant as seller and include a description of the mobile home. A "Record of Transaction" on this document, purporting to include "disclosures required by Federal Law," reflects statements of cash price, cash down payment, unpaid balance of cash price, other charges (including in this instance mobile home insurance and credit life insurance), amount financed, finance charge, total of payments, deferred payment price, annual percentage rate, and payment schedule. The blanks corresponding with these terms were filled in by typewritten figures. In bold-face print, of a larger sized type than the remainder of the contract, and in all capital letters, the following statements are printed:

"Notice to the buyer: 1. Do not sign this contract before you read it or if it contains any blank spaces. 2. You are entitled to an exact copy of the contract you sign.

"Buyer acknowledges receipt of a true copy of this contract and certifies that the terms of the transaction are correctly stated herein."

Immediately beneath these slogans is the typed-in date of January 16, 1973, plaintiff's signature, and the signature of Glenn E. Fox as an officer of defendant. In his testimony, plaintiff admitted to signing this document, but stated that the blanks had not been filled in when he signed it. This assertion is the crux of plaintiff's suit.

Mrs. Frances L. Bone testified that she accompanied plaintiff to defendant's place of business on January 12, that

she observed him sign only one document that day, that plaintiff's Exhibit 1 was the document he signed, and that the mobile home was delivered on January 15.

Plaintiff called Glenn E. Fox, president of defendant, as a witness. Fox testified that credit sales to consumers constituted a substantial part of defendant's business. He stated that the "Retail Installment Contract" form, such as Plaintiff's Exhibit 3, was furnished defendant by Midland-Guardian Co., to which defendant discounted its commercial paper. In describing the usual procedure by which a contract is executed, Fox said that a salesman for defendant prepares a worksheet with a customer, the secretary types the installment contract based on the worksheet, and that the completed contract is then brought to Fox for his signature.

Defendant's only witness was Jimmy T. Tanner, who was employed in January, 1973, as a lot manager and mobile home salesman for defendant. It was Tanner who negotiated the sale to plaintiff. He identified Plaintiff's Exhibit 1 as a worksheet, and he produced another worksheet (admitted as Defendant's Exhibit A) which he had prepared during negotiations with plaintiff. Tanner testified that these worksheets are used as a basis for discussion with a prospective customer, that several may be prepared before an agreement is reached, that they are used to give the customer a general idea of the terms of the contemplated transaction, and that they are not used as final contracts themselves. Tanner compared the worksheet kept by plaintiff (Plaintiff's Exhibit 1) with the worksheet produced by Tanner (Defendant's Exhibit A) and noted a difference of some $242.15 in the "Delivered Price Total." Tanner explained that most of this difference was accounted for by a charge of $205 assessed for removing plaintiff's burned mobile home from the lot and setting up the replacement home.[1] With minor variations, the figures from Defendant's Exhibit A were eventually transferred and used on the final installment contract, Plaintiff's Exhibit 3, which Tanner said was the only contract entered into between the parties.[2]

As to the date the contract was consummated, Tanner referred to a credit application (admitted as Defendant's

---

[1]. The rest of the difference in prices quoted on the two worksheets is attributable to defendant's error in computing the state sales tax. On Plaintiff's Exhibit 1, the price of the unit was quoted at $3,100.00, with $63.00 sales tax added, for a "Delivered Price Total" of $3,163.00. On Defendant's Exhibit A, the $205.00 set-up charge was added to the unit price for a sub-total of $3,305, and the sales tax computed on the sub-total was $99.15, for a "Delivered Price Total" of $3,405.15. Obviously defendant erred in computing a sales tax on the set-up charge. Defendant remedied this mistake on March 3, 1973, when it issued plaintiff a check for $36.15 for "over charge on sales tax." The cancelled check was introduced as Defendant's Exhibit B.

[2]. There was some indication that the genesis of plaintiff's dissatisfaction with defendant was the $205 set-up charge, which was not reflected on the worksheet kept by plaintiff, but which was shown on Tanner's worksheet and eventually became a part of the "cash price" as quoted on the retail installment contract. However, disclosure of the cost of merchandise, its components, accessories, and related services which may be included in the "cash price" are not regulated by the Truth in Lending Act. Instead, the Act's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C.A. § 1601; see also discussion in Mourning v. Family Publications Service, Inc., 411 U.S. 356 at 363–369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The Act's thrust is more toward a disclosure of credit terms than toward the various components which may make up an article's cash price, although the cash price itself must be disclosed, 15 U.S.C.A. § 1638. Thus the only legal basis for plaintiff's suit under the Act is his contention that the required credit disclosures were not made to him at the time of the contracting, in that the contract was blank when he signed it. A contention that the purchaser was not made aware of a particular component of the cash price would not be cognizable in a suit brought under the Act.

Exhibit C) signed by plaintiff on January 12. The defendant's procedure called for the credit information to be telephoned to the "finance people" (presumably Midland-Guardian Co. in Atlanta, Georgia), and not until the purchaser's credit was approved was the final contract prepared. In plaintiff's case Tanner noted that the credit application was signed on January 12, a Friday; the information would have been relayed to the finance company on the same day, but, according to Tanner, credit approval would not have been forthcoming until the next business day, Monday, January 15. Defendant contends that this usual mode of procedure indicates that the final contract could not have been signed on January 12, as plaintiff contends.

More specifically, Tanner testified that he recalled seeing plaintiff sign the contract (Plaintiff's Exhibit 3), that it was completely filled out at the time he signed it, and that it was not signed until January 16 or later. Tanner further testified that, although he could not recall the exact day the mobile home was delivered, it would have been after January 16, because the defendant required that a contract be executed before a unit was delivered. Tanner also stated that he never allowed anyone to sign a blank installment contract, and that his "bosses were very strict on that."

In reply plaintiff called Virginia Partin, manager of Key's Trailer Park, who testified that she was at the park when the trailer was delivered, and that the delivery date was January 15.[3]

Based upon the foregoing summary of testimony, and the exhibits introduced at trial, the court makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. In January, 1973, plaintiff entered into negotiations with defendant, a mobile home dealer, to purchase a used mobile home. As part of these negotiations plaintiff applied for credit to finance the unpaid balance of the purchase price of the mobile home.

2. The negotiations between the parties culminated in a contract, embodied on a form entitled "Retail Installment Contract" (Plaintiff's Exhibit 3), on January 16, 1973. In making this finding I note the recital of the contract itself, which states that it was "Signed this 16th day of January, 1973, at North Augusta, South Carolina." I credit the testimony of the witness Tanner, defendant's salesman, who stated that he recalled the contract being signed on January 16 or thereafter. I also credit Tanner's description of defendant's operating routine, including the procedures followed for application for credit, approval of credit, preparation of worksheets, preparation of contract, and execution of contract. Applying the uncontradicted evidence that plaintiff applied for credit on January 12 (Defendant's Exhibit C) to these procedures, I find it incredible that the final contract was consummated on the same day plaintiff applied for credit. Plaintiff sought to prove that the contract was signed on January 12 by showing that the mobile home was delivered on January 15. However, I do not credit the testimony of plaintiff's two witnesses who claimed to recall the home being delivered on January 15.

3. The "Retail Installment Contract" (Plaintiff's Exhibit 3) was the sole contract entered into between the parties. It is the only document of a contractual nature introduced into evidence which is signed by both parties. The standard language printed on the reverse of the

---

3. When cross-examined as to how she could remember with such precision the date of a trailer's delivery some ten months previously, Mrs. Partin admitted that she could not recall the exact delivery date of the latest trailer brought into her park, though one had been brought in "recently."

form contract states, "This Contract contains the entire agreement between the parties and no oral agreement shall be binding."

4. The "Retail Installment Contract" (Plaintiff's Exhibit 3) was completely filled in, that is, all material blank spaces on this form contract were filled by the figures and other information reflecting the agreement between the parties, at the time that the document was signed by the plaintiff and by Glenn E. Fox for the defendant. In making this finding I credit the testimony of the witness Tanner, who stated that he recalled that the contract was filled in when plaintiff signed it. Tanner related that his employers emphasized that he should not allow a customer to sign a blank installment contract. I also note the conspicuous notice on the contract itself, warning the buyer not to sign the contract "if it contains any blank spaces."

5. Plaintiff's purpose in making this purchase was to replace a rental mobile home which had been destroyed by fire. Thus plaintiff intended to use his purchase as rental property, and to supplement his income with the rents he received from the tenant occupying his mobile home. Plaintiff's primary occupation was that of a barber.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and of the subject matter of this action. 15 U.S.C.A. § 1640(e). Venue is appropriate in this division because the transaction complained of was consummated at defendant's place of business in North Augusta, South Carolina.

2. The Consumer Credit Protection Act, also known as the Truth in Lending Act, was enacted and became effective in 1968. The subchapter relating to consumer credit cost disclosure has as

its purpose "to assure a meaningful disclosure of credit terms . . ." 15 U.S.C.A. § 1601 (1973 Supp.).

3. The transaction here involved was a "credit sale" as defined by the Act at 15 U.S.C.A. § 1602(g); the defendant herein was a "creditor" as defined by the Act at 15 U.S.C.A. § 1602(f).

4. The credit disclosures required to be made by a creditor to a consumer under the circumstances of a consumer credit sale are embodied in 15 U.S.C.A. § 1638 and in the regulations promulgated by the Federal Reserve System reported at 12 C.F.R. § 226.8(c) (1973).[4]

5. The required credit disclosures must be made before the credit is extended, and may be made by disclosing the information in the contract to be signed by the purchaser. 15 U.S.C.A. § 1638(b); Burgess v. Charlottesville Savings and Loan Association, 477 F.2d 40 (4th Cir. 1973).

6. The form contract utilized by defendant in recording the transaction between the parties complied with the disclosure requirements of the statutes and regulations referred to above, and the disclosures were made at the appropriate time as required by the statute. Thus, with the properly filled in form contract, defendant disclosed to plaintiff all of the credit information required by law.

7. Specifically exempted from the disclosure requirements of the Truth in Lending Act are "credit transactions involving extensions of credit for business or commercial purposes." 15 U.S.C.A. § 1603(1); see also 12 C.F.R. § 226.3(a). In this connection, the regulations define "consumer credit" as meaning "credit offered or extended to a natural person, in which the money, property, or service which is the subject of the transaction is *primarily for personal, family,*

4. The Board of Governors of the Federal Reserve System is authorized by 15 U.S.C.A. § 1604 to "prescribe regulations to carry out the purposes of this subchapter." The reg-

ulations pertaining to Truth in Lending, popularly known as "Regulation Z", are reported at 12 C.F.R. § 226.1 et seq.

*household, or agricultural purposes.
. . ."* 12 C.F.R. § 226.2(k) (emphasis supplied); see also 15 U.S.C.A. § 1602(h).

■ 8. The court therefore further concludes as a matter of law that the transaction here involved was for business purposes and thus was exempt from the Act. The court is guided in this determination by the only two reported cases its research uncovers which deal with an interpretation of the "business or commercial purposes" exception.[5]

In Sapenter v. Dreyco, Inc., 326 F. Supp. 871 (E.D.La.), aff'd. 450 F.2d 941 (5th Cir. 1971) (per curiam), cert. denied 406 U.S. 920, 92 S.Ct. 1775, 32 L. Ed.2d 120 (1972), the plaintiffs in a Truth in Lending suit owned two pieces of real estate, one of which was their residence and the other a six-unit apartment building. The credit transaction which plaintiffs complained of as deficient under the Act involved the execution of a mortgage on their residence for the purpose of extending a past-due obligation which they had incurred on the rental property. The defendant moved to dismiss, citing, *inter alia*, the "business or commercial purposes" exemption of the statute. The plaintiffs countered that they were not in the business of owning real estate, but were otherwise employed and owned the apartment building merely as an investment, collecting the rent in their spare time. In granting the defendant's motion to dismiss, the court stated:

> "The Truth In Lending Act exemption of credit extensions 'for business or commercial purposes' does not distinguish between full-time and part-time businesses. . . . Defendant's extension of credit to plaintiffs . . . was certainly not for 'personal, family, household or agricultural purposes.' Rather, it was to extend a past due obligation which plaintiffs

had incurred on rental property which they purchased and owned as an investment. Plaintiffs intended to rent the apartments and derive revenues therefrom. While they may have had other, full-time occupations, plaintiffs were nevertheless engaged in the 'business' of owning and renting real estate for profit. Extensions of credit for such purposes were not intended by Congress to come within the purview of the Truth In Lending Act. 15 U.S.C. § 1603(1)." 326 F.Supp. at 873–874.

Similarly, Brill v. The Newport National Bank, reported only at CCH Consumer Credit Guide ¶ 99,057 (S.D.N.Y. 1973), was a Truth in Lending action challenging disclosures made in conjunction with a bank loan made to refinance a building owned by plaintiffs with five apartment units. The plaintiffs contended that the building, located at Newport, Rhode Island, and known as "Fair Oak", was purchased by them for use as a summer home, and alternatively they contended that even if their purchase of the building was found to have been made for business purposes, the loan in question was intended by the plaintiffs and the bank to be a personal loan, and the fact that it was secured by a mortgage on the "Fair Oak" property did not convert what was essentially a personal loan into a commercial loan. Judge Lombard, Senior Circuit Judge of the Second Circuit sitting on the district bench by designation, found as a fact that the property was bought and operated as a business venture, noting that some of the apartments were held out for rent year round. The court further found that the loan in question was made to refinance "Fair Oak" and to make needed repairs on the property, and thus found that the loan transaction was a business loan.

---

5. The few cases construing this recent legislation are collected in an annotation, "Civil Remedies of Consumer for Violations of Truth in Lending Act," 11 A.L.R.Fed. 815 (1972).

Judge Lombard also discussed the Federal Reserve Board's official "Interpretation" of the business exemption. This "Interpretation," the Board's explanation of its regulations, is reported at 12 C.F.R. § 226.302 and states:

"§ 226.302 *Credit for business or commercial purposes—more than 4 family units*. (a) Under § 226.3(a), extensions of credit for business or commercial purposes, other than agricultural purposes, are not subject to Regulation Z. The question arises as to whether an extension of credit relating to a dwelling (as defined in § 226.2(p)) which contains more than four-family housing units is an extension of credit for business or commercial purposes.

(b) Credit extended to an owner of a dwelling containing more than four-family housing units for the purpose of acquiring, financing, refinancing, improving, or maintaining that dwelling is an extension of credit for business or commercial purposes."

The parties in *Brill* wanted to address themselves to the issue of whether "Fair Oak" contained more than four family units, so as to come within the Interpretation, but Judge Lombard felt that such a determination was unnecessary. The court ruled that even if the building contained fewer than four units, "the parties' intent and the nature of the transaction govern. In any event, since the court has found that the loan was made for a business purpose, the transaction falls within the literal language of the statutory exemption." Thus the court found that the loan at issue was excluded from the Act's coverage and dismissed the complaint.

The courts in *Sapenter* and *Brill* gave a strict and literal interpretation to the "business or commercial purposes" exception of the Act. Those interpretations influence the court here. The instant factual situation differs from those in *Sapenter* and *Brill* only in degree—plaintiff's operation here was not so grand as the six-unit apartment building in *Sapenter* or the "Fair Oak" property at Newport in *Brill*.[6] The statutory exception does not distinguish big business from small business; all business transactions are exempt. Plaintiff's contention that he is not in the "business" of renting property, but is otherwise employed, was specifically rejected by the court in *Sapenter*. His contention that the instant loan was for a personal investment, rather than a business loan, was similarly rejected by the court in *Brill*. The court is persuaded to the view that the type of transaction presented by the instant facts is specifically excluded from the disclosure requirements of the Act.

The court's conclusion of law that this transaction was exempted from the Act's disclosure requirements is sufficient grounds to dismiss the complaint. But even if this transaction were found not to be exempted under § 1603(1), the court has found as a fact that all required disclosures were properly and timely made to plaintiff by defendant. Thus, under either of these two findings, plaintiff's action must fail. It is therefore concluded that the complaint should be dismissed, and that the clerk should enter judgment for the defendant.

And it is so ordered.

---

**6.** Plaintiff testified that his 1972 income was approximately $5000. He stated that he rented the mobile home for $90 per month, a yearly gross of $1080. It is unclear whether his net income from renting the mobile home was included in his total earnings estimate of $5000.