In re Alyce SOUDERS, Debtor.

Bankruptcy No. 86–05446S.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 10, 1987.

William M. Barnes, Philadelphia, Pa., for movant.

Edward J. DiDonato, Philadelphia, Pa., for debtor.

Edward Sparkman, Philadelphia, Pa., Chapter 13 Standing Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The Motion for Modification of the Automatic Stay presented to us for determination in the instant case raises several difficult issues. The first is a procedural issue concerning the nature of defenses which may be raised by the Debtor in fending off such Motions generally. We hold that we can consider any defenses which are directly related to the status of the Movant's claim and that in so doing, we are not prevented, by principles of res judicata, from looking behind a state court judgment, particularly when, as here, that judgment is the sole basis for the Movant's contention that its claim is secured and when there are allegations which challenge compliance with the requisite state court proceedings and/or the constitutionality of those proceedings, which would render the judgment totally invalid.

This ruling allows us to examine whether the Movant's attempt here to execute upon a confessed judgment obtained against the Debtor violated her federal constitutional right to due process of law, and whether the Movant complied with applicable state law in attempting to execute upon and in reviving the aforesaid judgment. Because we find that an attempt to execute against the Debtor's property on the basis of the instant confessed judgment would be violative of the Debtor's rights to due process of law, and that the Movant's right to proceed against the Debtor is barred on this basis, and we observe that there is considerable question as to whether the applicable state law and procedures pertaining to execution and revival of this judgment, assuming *arguendo* the judgment's constitutionality, has been followed, we shall deny the Motion.

The Debtor, ALYCE SOUDERS, is a 62-year-old widow who filed a Chapter 13 bankruptcy Petition on November 26, 1986. On February 9, 1987, James D. Morrissey, Inc. (referred to hereinafter as "the Movant") filed the Motion in issue. On February 26, 1987, the Debtor responded with an Answer raising eleven separate "affirmative defenses," including contentions that there was no factual basis for the judgment underlying the Movant's judicial lien, which purportedly rendered its claim unsecured; that the balance due had been erroneously computed in light of payments made by Debtor on the debt; that the revival of the judgment was improper; and that, because of past threats and the Movant's long and perhaps calculated delay in proceeding, it was inequitable to allow the Movant to succeed in its purposes at this juncture.

On March 24, 1987, we conducted a lengthy hearing in these proceedings. In light of the fact that the Debtor presented us with a Memorandum of Law at the close of the hearing, we ordered, in the way of further briefing, that the Movant submit a Brief on or before April 7, 1987, and the Debtor a Reply Brief on or before April 21, 1987. We also directed that the automatic stay remain in place pending our decision on the Motion.[1] These Briefs were filed, and thereafter the Movant, apparently without the consent of the opposing party or leave of court, submitted a Reply Brief on April 24, 1987, a practice which we disapproved in *In re Jungkurth; Jungkurth v. Eastern Financial Services, Inc., et al.*, 74 B.R. 323, 325–26 (Bankr.E.D. Pa.1987).

Although we recognize that it is within our discretion to dispense with this procedure, and draft our Opinion in narrative form, as we are deciding a Motion, *see In re Campfire Shop, Inc.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987), the presence of several significant factual issues prompts us to prepare this Opinion in the classic form of Findings of Fact, Conclusions of Law, and a Discussion.

## B. FINDINGS OF FACT

1. The Debtor was employed as a Payroll Clerk by the Movant in 1948, in which position she had full responsibility for preparation of the Movant's payroll records and checks.

2. Beginning in 1949, the Debtor began a regular pattern of embezzling money from the Movant by writing small, unauthorized checks both to herself and, before and after her marriage in 1951, to her late husband, Alfred Souders.

3. The embezzlement was uncovered by the Movant in October, 1954. Shortly thereafter, the Movant, by its Counsel, Louis F. Floge, Esquire, presently a practicing attorney for over fifty years and a partner in the large and prestigious Philadelphia law firm of Schnader, Harrison, Segal, and Lewis, met with employees of the Movant and the Debtor and her husband, and the Debtor confessed to the embezzlement.

4. During the meeting with Mr. Floge and the Movant's employees, the Debtor was not represented by counsel, and reasonably and probably accurately believed, although same was not expressly stated to her, that if she failed to cooperate with the demands of the Movant, she would face criminal prosecution.

5. The Movant demanded that the Debtor and her husband do the following to compensate the Movant for its losses, all of which they agreed to do:

a. Sign a Statement by Alyce Souders admitting her guilt. Neither the Debtor nor the Movant had any exact record of the amount embezzled, which is reflected by the following excerpt from the Statement: "I think the amount stolen by me ... was $15,000.00, but it could have been more than $30,000.00."

b. Allow the Movant to sell their family home at 6820 Cottage Street, Philadelphia, Pennsylvania, and their family car, a Pontiac automobile, and retain the net proceeds therefrom. These items were not appraised, and the terms and conditions of sale were determined solely by the Movant. The sales of both the home and the auto took place in the spring of 1955, and the Movant, without further elaboration as to its computations of same in this record, credited the Debtor with $2,261.84 and $482.74, from the sale of the home and the auto, respectively.

c. Execute a Demand Note in the amount of $29,231.31, which was apparently the maximum possible sum that the Movant conceived that the Debtor could have taken.

d. Make restitution payments of $10.00 weekly for an indefinite period.

6. The full text of the Demand Note was as follows:

---

1. The Movant's contention that, per 11 U.S.C. § 362(e), the stay terminated by operation of law on March 11, 1987, is fully answered by our Opinion in *In re Clark*, 69 B.R. 885, 891–92 (Bankr.E.D.Pa.1987).

$29,231.31 Philadelphia, Pennsylvania, November 4, 1954

On demand after date ... we promise to Pay to the Order of James D. Morrissey, Inc. Twenty nine thousand two hundred thirty one Dollars and thirty-one cents, without defalcation, value received, with interest.

And further, we do hereby authorize and empower any Attorney of any Court of Record of Pennsylvania, or elsewhere, to appear for and to enter Judgment against us for the above sum, with or without declaration, with costs of suit, release of errors, without stay of execution, and with five per cent added for collection fees; and we also waive the right of inquisition on any real estate that may be levied upon to collect this note, and do hereby voluntarily condemn the same, and authorize the Prothonotary to enter upon the FI. FA..........
said voluntary condemnation, and we further agree that said estate may be sold on a FI. FA., and ....... hereby waive and release all relief from any and all appraisement, stay or exemption laws of any State, now in force, or hereafter to be passed.

Witness,

(signed) Harold B. Borneman   (signed) Alfred J. Souders
(signed) Louis J. Floge        (signed) Alyce L. Souders

7. The Debtor, who is not a high school graduate, testified that neither she nor her husband understood the wording or significance of the Demand Note and that, particularly, they were unaware of the fact that interest would accrue at any rate or that the note contained a "confession of judgment" clause, or what the significance of such a clause could be, and they did not consult counsel about this matter. We fully credit this testimony, and we observe that the term "with interest" is not conspicuous on the Note, nor is any explanation of the rate provided thereon, and the "confession of judgment" clause contains many archaic terms (*e.g.*, references to "the right of inquisition" and "FI. FA.") which would not be clear to even a well-educated layman.

8. The Movant produced, at trial, a Chronology of Payments made to it by the Debtor. These indicate that the Debtor began making the $10.00 weekly payments in December, 1954, and made the equivalent of the following amounts each year thereafter:

| | | |
|---|---|---|
| 1954 | – | 5 |
| 1955 | – | 50 |
| 1956 | – | 48 |
| 1957 | – | 52 |
| 1958 | – | 52 |
| 1959 | – | 18½ |
| 1960 | – | 30 |
| 1961–67– | – | 109½ |
| 1968 | – | 9 |
| 1969 | – | 12 |
| 1970–71 | – | 14 |
| 1972–73 | – | 17 |
| 1974 | – | 29 |
| 1975 | – | 11 |
| 1976 | – | 9 |
| 1977 | – | 10 |
| 1978 | – | 10 |
| 1979 | – | 23½ |
| 1980 | – | 13 |
| 1981 | – | 12 |
| 1982 | – | 12 |
| 1983 | – | 12 |
| 1984 | – | 12 |
| 1985 | – | 12 |
| 1986 | – | 6 |

9. On October 29, 1962, the Movant, without prior notice to the Debtor, had a confessed judgment on the Demand Note entered in the Court of Common Pleas of Philadelphia County, at September Term, 1962, No. 2549, although no amount of damages was then assessed.

10. At the time that the judgment was entered, the Debtor was earning about $7,000.00, and her husband was earning more than she. Hence, their conjugal income exceeded $10,000.00.

11. The Movant, at trial, produced a Calculation of Amount Due on the Demand Note on which the Movant computed the amount by the following method:

a. The beginning balance was $29,-231.31.

b. Payments made as of December 31, 1955, and, thereafter, each year as of December 31st, were deducted.

c. Interest of six (6%) percent was computed on the balance as of December 31st each year, and this figure was added to the balance carried forward to the next year.

As of December 31, 1986, this method of computation resulted in an alleged balance due of $147,933.75.

12. Per the Docket Entries of the Common Pleas Court confessed judgment case, admitted into the record, but in some instances illegible, the Movant revived the judgment entered at various intervals, assessing damages, in accordance with the computations arrived at by the calculations set forth in paragraph 11, as follows:

| Date of Revival | Damages Assessed |
|---|---|
| June 7, 1967 | $47,907.46 |
| June 7, 1972 | (illegible—appears to be about $62,000.00) |
| July 21, 1976 | (no amount appears) |
| November 28, 1980 | $97,410.71 |
| September 20, 1984 (damages reassessed) | $94,544.88 |

13. On June 7, 1985, the Docket Entries indicate that a Writ of Revival and a Praecipe were filed by the Movant, but these are the last Entries on the copy of same submitted.

14. The Movant produced documents certified from the case record which included a Praecipe for Judgment for Failure to Plead to Writ of Revival, time-stamped as of October 16, 1985, which requested that a total judgment of revival in the amount of $120,782.93 be entered. At the bottom of the document is typed in, apparently by the Movant's counsel, the phrase "Judgment entered and damages assessed as above," but there is no signature or notation included under this phrase indicating that the judgment was in fact so entered or damages so assessed. In the upper right-hand corner, this document bears what appears to be a stamped imprint: "HAS BEEN INDEXED ZEITZER."

15. The Debtor and her late husband purchased the Debtor's present home, located at 138 Meadow Lane, Philadelphia, Pennsylvania 19154, on July 7, 1961, for $13,290.00. When her husband died on June 10, 1985, the Debtor became the sole owner of the premises.

16. H. Edward Carter, a qualified real estate appraiser called by the Movant, valued the premises, as of March 16, 1987, at $70,000.00. Although the Debtor contended that she believed the premises to be worth only between $50,000.00 and $55,000.00, we credit the more educated opinion of Mr. Carter and find the premises to be worth $70,000.00.

17. On September 3, 1986, by which date the Debtor had reduced the balance on the mortgage which was taken against her present home when she purchased it to about $6,000.00, the Movant executed on the Debtor's residence and scheduled it for a sheriff's sale on December 1, 1986, which was stayed by the filing of this case on November 26, 1986.

18. The Movant did not allege any attempts to comply with Act No. 6 of 1974, 41 P.S. § 101 et seq. (hereinafter referred to as "Act 6"), prior to attempting to execute on this judgment, and the docket entries also reflect no actions in compliance therewith.

## C. CONCLUSIONS OF LAW

1. The defenses raised by the Debtor consist of contentions which, if proven, would invalidate the Movant's judgment and bar execution by the Movant on such a judgment, and hence can be raised as defenses to this Motion for relief from the automatic stay.

2. Since the pertinent Pennsylvania law and procedure contain no provisions for testing whether the obligor of a confessed judgment has validly waived the due process rights forfeited by giving effect to such a confessed judgment, those procedures are violative of due process of law, both on their face and as applied to the Debtor.

3. In addition, Act 6 bars execution on a confessed judgment in a "residential mortgage obligation" within its scope, such as the Demand Note in issue. *See* 41 P.S. § 407.

4. There is considerable doubt whether the Movant properly revived the judgment in issue after August 28, 1980.

5. Since the Movant does not have a constitutionally valid judgment against the Debtor, nor, in any event, a judgment which could serve as a valid basis for execution against her home, the Movant lacks a valid secured claim against the Debtor which could serve as the basis for finding cause to grant the Movant relief from the automatic stay, per 11 U.S.C. § 362(d)(1).

6. The equities do not favor granting the Movant relief from the automatic stay.

7. The Motion in issue must be denied.

## D. DISCUSSION

### 1. THE DEBTOR MAY RAISE DEFENSES TO THIS MOTION WHICH CHALLENGE THE LEGALITY OF THE JUDGMENT OF THE MOVANT, EXECUTION OF THE JUDGMENT, AND/OR ITS REVIVAL

The initial issue which we address, which we raised *sua sponte* (as we did most of the issues in this case), was whether the Debtor could, in defending a Motion for relief from the automatic stay, per 11 U.S.C. § 362(d), properly attack the judgment and other aspects of the state court procedures invoked by the Movant in scheduling a sheriff's sale of the Debtor's premises. Our review of the pertinent caselaw convinces us that we not only may, but must, under the circumstances, consider those defenses which not only "strike at the very heart" of the validity of the Movant's secured claim, *see In re Pappas*, 55 B.R. 658, 661 (Bankr.D.Mass.1985); and *United Companies Financial Corp. v. Brantley*, 6 B.R. 178, 185 (Bankr.N.D.Fla. 1980), but hit their mark.

■ The vast weight of authorities on this point, beginning with *Brantley*, have consistently distinguished between defenses which are only "indirectly related" or could plausibly serve as a reduction or set-off to the § 362(d) Movant's claim, which may not be asserted as defenses or counterclaims to a motion pursuant to § 362(d), and those which, if successful, would bar any recovery on the debt or any lien enforcement, and hence *can* be asserted as defenses. 6 B.R. at 185. Where the de-

fenses asserted are merely a "formless morass of self-serving conclusory statements," *In re Gellert*, 55 B.R. 970, 975 (Bankr.D.N.H.1985), or are not supported by evidence, *In re Paolino*, 72 B.R. 555, 557–58 (Bankr.E.D.Pa.1987), they will not be considered.

On the other hand, it is permissible for bankruptcy courts to look behind state court judgments in considering defenses which would bar any recovery. Hence, "the doctrine of *res judicata* is inapplicable," *In re Lockwood*, 14 B.R. 374, 378 (Bankr.E.D.N.Y.1981), in considering such defenses, and thus it is not true, as the Movant suggests, that attacks on state court judgments are prohibited in this context. To the contrary, "[a]ffirmative defenses and other arguments in opposition proferred by a debtor which contest the validity of the rights asserted by the movant are often determinative of whether relief from the stay is appropriate," *In re Compass Van & Storage Corp.*, 61 B.R. 230, 234 (Bankr.E.D.N.Y.1986), and hence may be asserted.

We find the decisions of our predecessors, former Chief Judge Goldhaber and Judge King, cited by the Movant, to be totally consistent with these principles. While the Court of Appeals, in *In re Roloff*, 598 F.2d 783 (3d Cir.1979), undoubtedly posited a much narrower scope of permissible defenses to motions for stay relief in construing the predecessor Bankruptcy Act, Judge Goldhaber, in *In re Vacuum Cleaner Corp. of America*, 33 B.R. 701, 705–06 (Bankr.E.D.Pa.1983), reviews the legislative history of the present Bankruptcy Code, and concurs with the reasoning of *Brantley, supra*, in applying the Code as opposed to applying the Act. Judge King, in *In re Dennison*, 50 B.R. 950, 954–55 & n. 4 (Bankr.E.D.Pa.1985), observes that *Roloff* was decided "under a different jurisdictional scheme than the one presently in existence," and also cites to *Brantley* with favor.

■ The closest analogue to the contention of the Debtor that improper revival of the judgment could be considered significant by this Court is contained in *In re*

*Lucas,* 41 B.R. 785 (Bankr.E.D.Pa.1984). Without discussing the issue, Judge Goldhaber implicitly assumes that a defect by an alleged secured creditor in attempting to effect an revival of a state court judgment can be grounds for setting aside a sheriff's sale based on the judgment. By implication, it seems clear that we can consider whether the judgment here is violative of state law or the federal constitution. We have no hesitancy in concluding that the constitutional and statutory validity of a state court judgment, let alone its revival, can be asserted by a debtor as defenses to a motion for relief from the automatic stay.

2. THE PENNSYLVANIA CONFESSION OF JUDGMENT PROCEDURES ARE VIOLATIVE OF DUE PROCESS OF LAW, BOTH ON THEIR FACE AND AS APPLIED TO THE JUDGMENT IN ISSUE, AND HENCE WE CAN GIVE NO WEIGHT TO CONFESSED JUDGMENT IN ISSUE

A confession of judgment clause, and its enforcibility, are anomalies in the law. Such a clause permits an obligee to obtain what is normally a judge's determination in his favor (a "judgment") by the mere fact that the contract, at the outset of the transaction, before any breach has occurred, contains a clause by which the obligor "confesses judgment."

The use of such a clause in a contract thus allows an obligee to invoke the judicial process against his obligor without having to prove, in an adversarial proceeding, that any default has occurred. In sum, its use stands the most basic of principles of the adversarial system on its head, and results in the conscience of the obligee being the only control in the invocation of the state process of enforcement of judgments against the obligor.

A fertile source for obtaining a perspective on the drastic effect and lack of prevalence of (and hence absence of policy suggesting any countervailing need for) the use of confession of judgment is contained in that portion of the Statement of Basis and Purpose and Regulatory Analysis issued by the Federal Trade Commission (hereinafter referred to as "the FTC"), 49 FED.REG. 7748–55 (March 1, 1984), when it issued a Credit Practices Rule, 16 C.F.R. § 444.2(a)(1), which declared it an unfair trade practice "to take or receive from a consumer an obligation that ... [c]onstitutes or contains a cognovit or confession of judgment ... or other waiver of the right to notice and the opportunity to be heard in the event of suit or process thereon." Quoted with approval, at 49 FED. REG., *supra,* at 7748 n. 2, is Justice Musmanno's classic statement in *Cutler v. Latshaw,* 374 Pa. 1, 4–5, 97 A.2d 234, 236 (1953), that such a clause "is perhaps the most powerful and drastic document known to civil law ... equivalent to a warrior of old entering a combat by discarding his shield and breaking his sword." The national survey conducted by the FTC revealed that Pennsylvania was and still remains unique in giving vitality to confession of judgment, 49 FED.REG., *supra,* at 7749–53, and by failing to provide post-judgment remedies which are the procedural equivalent of a trial de novo to debtors who have executed contracts containing confessed judgments, *id.* at 7751, thereby requiring federal regulatory intervention to prohibit their use in this state, as in all other jurisdictions, in consumer transactions. *Id.* at 7753.

The federal courts, like the FTC, have been invoked by Pennsylvania debtors as a means for attacking the unique and unconscionable system authorizing the use of confession of judgment which, by the 1960's, resulted in its use and enforcement in almost every form of consumer obligation, including loans, installment sales, mortgages, and leases, in this state.

In *Swarb v. Lennox,* 314 F.Supp. 1091 (E.D.Pa.1970) (three-judge court), *aff'd,* 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972), a local federal court dealt a glancing, but significant, blow to the pervasive use of confession of judgment in Pennsylvania by the declaring of any further entry of confessed judgment and any further use of confessed judgments unconstitutional as to only a certain limited class of individuals, *inter alia,* only those whose "conjugal incomes" were less than $10,000.00 annual-

ly at the time of signing of leases and consumer financing documents, excluding mortgages. 314 F.Supp. at 1103, 1102.

Consistent with the less than vigorous defense which the consumer finance industry had presented in *Swarb*, doubtless from a realization that confession of judgment was difficult to defend morally as well as legally, only the plaintiffs took an appeal from the *Swarb* three-judge court decision to the Supreme Court, arguing that the court erred in not extending its ruling and wiping out confession entirely. The *Swarb* appeal was argued and decided with *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), a case in which a large corporation that had executed a confession of judgment in the last of a series of negotiated work-outs challenged the judgment subsequently entered against it after default on the ground that confessed judgments were unconstitutional per se.

The Supreme Court rejected the argument that confession was unconstitutional per se and as applied to the obligor in *Overmyer*. However, the Court expressly stated that its holding was not to be construed as "controlling precedent for other facts of other cases," where such elements as adhesion contracts, great disparity in bargaining power, and lack of consideration for the confession existed. 405 U.S. at 188, 92 S.Ct. at 783.

The Court then utilized its decision in *Overmyer* to meet the argument of the *Swarb* appellants that use of confession of judgment was unconstitutional per se, which it analyzed as the only issue before it. The Court rather cryptically indicated that it did not necessarily approve "other aspects and details that are not before us," in affirming the three-judge court's decision, 405 U.S. at 201, 92 S.Ct. at 772, and ended the Opinion with several "observations," one of which was reiteration of the *Overmyer* caveats as to situations where unfair bargaining power existed and remarking that "[p]roblems of this kind are peculiarly appropriate grist for the legislative mill." *Id.* at 201, 92 S.Ct. at 772. The three-judge panel, in originally continuing its injunction only through the date of the next legislative session, also clearly signalled to the legislature that it hoped that its decision would spur it to act to resolve the confession of judgment problem in comprehensive fashion. 314 F.Supp. at 1103.

Unfortunately, except for prohibiting execution on "residential mortgage obligations" in Act 6, 41 P.S. § 407, the Pennsylvania "legislative mill" has failed to grind out any such sort of comprehensive resolution to the unique Pennsylvania tolerance of confession of judgment. Therefore, what both the three-judge panel and the Supreme Court undoubtedly envisioned as a stop-gap solution which the courts strongly suggested that the legislature should address in a comprehensive mode has become an unintended permanent statement of the circumstances in which confession of judgment can and cannot be utilized. In practical effect, the impact of *Swarb* was significant, and few cautious lawyers appeared ready to test the constitutional waters by attempting to utilize confessions of judgment in other than negotiated business transactions within the scope of *Overmyer* in the wake of these decisions. However, the quirks of the *Swarb* opinion—the lack of clarity of the application to leases and quasi-consumer transactions like that in the instant case and the limitation of the direct holding in *Swarb* to parties whose annual conjugal income exceeds $10,000.00—[2] occasionally arise.

---

**2.** The most obvious factor effecting this aspect of the decision is inflation. Circuit Judge Frances L. VanDusen was the Court of Appeals member of both the three-judge panel in *Swarb* and in *Osmond v. Spence,* 327 F.Supp. 1349 (D.Del. 1971) (three-judge court), *vacated,* 405 U.S. 971, 92 S.Ct. 1189, 31 L.Ed.2d 245 (1972), *reinstated,* 359 F.Supp. 124 (D.Del.1972) (three-judge court). In *Osmond* Judge VanDusen dissented from the refusal of the two district judges to confine the scope of that decision to "poor" persons. This holding also sparked a dissent from one member of the *Swarb* panel. 314 F.Supp. at 1102. In so dissenting, Judge VanDusen referred to the "poverty guidelines" then in effect. 327 F.Supp. at 1361. These can be compared, as follows, to the present "poverty guidelines," to which we referred in our Opinion in *In re Bryant, Bryant v. PHEAA,* 72 B.R. 913, 916 & n. 3 (Bankr.E.D.Pa.1987):

In light of the foregoing, we believe that it is important to emphasize the several aspects of the district court and Supreme Court decisions in *Swarb* and *Overmyer* in applying these cases to those instances where confession of judgment arises today. First, the holding in *Overmyer* is expressly limited by the Court to merely a statement that the use of confession of judgment may be constitutional, but only under statutory schemes which limit its application to situations where it is valid; and in those limited situations where it would be valid, i.e., a transaction where the use of confession is well known to both parties and expressly bargained for. Secondly, the holding in *Swarb* is merely that, under the Pennsylvania legislative scheme, the use of confession of judgment is per se unconstitutional as to a certain class of individuals, concerning whom the plaintiffs had met their burden of proving that its members did not waive their constitutional rights in signing confession clauses. Certainly, these cases do *not* hold, and could not logically hold, that the Pennsylvania scheme for use of confession *is* constitutional for everyone outside of the *Swarb* class. In fact, to so conclude would render the *Swarb* result, on its face, violative of the equal protection clause of the fourteenth Amendment as to the expanding group of Pennsylvania families whose annual conjugal income exceeds $10,000.00.

Shortly after the *Swarb* and *Overmyer* decisions, several courts wrestled with application of the principles established by these cases and the prior body of Supreme Court caselaw concerning due process of law and waiver of constitutional rights. We believe that the correct analysis is that initially applied by the *Osmond* court, of which Judge VanDusen of the *Swarb* panel joined except for the failure to limit the

class to poor persons. After carefully reviewing the cases establishing that confession of judgment involved a wholesale forfeiture of due process rights and that there was a strong presumption against any degree of waiver of any constitutional rights, the *Osmond* court looked to the Delaware statutory scheme there in question, comparable to that in Pennsylvania, to determine whether it contained provisions which would insure that such a waiver could occur only where the debtor knowingly, voluntarily, and intelligently waived such rights. *Compare Fuentes v. Shevin,* 407 U.S. 67, 94–96, 92 S.Ct. 1983, 2001–02, 32 L.Ed.2d 556 (1972). Finding that it did not, the court held as follows:

We conclude, then, that the Delaware scheme here under attack is totally defective in that, by failing to provide for notice and hearing preceding entry of judgment, there is no method of judicially determining whether or not a particular debtor knowingly and intelligently signed the judgment note waiving his 14th amendment rights. 327 F.Supp. at 1359.

Accordingly, the court declared the Delaware statutory scheme, on its face, "unconstitutional and void." *Id.* at 1361.

After the Supreme Court vacated its initial decision in light of *Swarb,* the *Osmond* panel reaffirmed the decision, in the following language, at 359 F.Supp. 127:

Unless a hearing is conducted on the waiver question before the judgment is entered, an alleged debtor will be deprived of his due process rights on every occasion when an effective waiver had not occurred upon initial execution of the note. The only procedure guaranteeing that such deprivation will not take place is to require hearings on the waiver issue before permitting judgments to be en-

| Family Size | 1971 | 1987 |
|---|---|---|
| 1 | $1,900.00 | $5,500.00 |
| 2 | 2,500.00 | 7,400.00 |
| 3 | 3,100.00 | 9,300.00 |
| 4 | 3,800.00 | 11,200.00 |
| 5 | 4,400.00 | 13,100.00 |
| 6 | 5,000.00 | 15,000.00 |
| 7 | 5,600.00 | 16,900.00 |

Hence, today, the poverty line figures have almost trebled since 1971, and the comparably

"poor" family within the scope of *Swarb* would today have an annual conjugal income of $30,-000.00.

It is clear to us that the course of inflation was certainly perceptible by Judge VanDusen, and this factor would seem to be proof positive that he never envisioned that the *Swarb* guidelines would be more than a stop-gap until the legislature resolved the problem of the use of confession of judgment in Pennsylvania.

tered. Therefore, the Court restates its holding that the original 10 Del.C. § 2306 is unconstitutional insofar as it permitted the entry of judgments on cognovit notes prior to a hearing on the issue of whether the debtor had effectively waived his due process rights by executing the note....

Reasoning identical to that of *Osmond* was adopted by other courts subsequent to the *Swarb* decisions. *See, e.g., Virgin Islands Nat'l Bank v. Tropical Ventures, Inc.,* 358 F.Supp. 1203, 1206–07 (D.V.I. 1973) (applied in business transaction); *Scott v. Danaher,* 343 F.Supp. 1272, 1277–78 (N.D.Ill.1972) (three-judge court); and *Isbell v. County of Sonoma,* 21 Cal.3d 61, 577 P.2d 188, 192–95, 145 Cal.Rptr. 368, 577 P.2d 188 (1978) (en banc).

Moreover, such reasoning has been applied by federal district courts in Pennsylvania in those isolated situations where certain obligees, usually landlords, have attempted to utilize confession of judgment and the state courts have allowed such use because the obligors were technically not within the *Swarb* class. Thus, in *Jordan v. Dorsey,* 587 F.Supp. 282, 284 (E.D.Pa.1984), the use of confession was enjoined due to the practices of the defendant state officials by former Chief Judge Lord

in filing, entering and executing upon confessed judgments without providing an opportunity for a pre-judgment entry challenge by tenants [as] to whether the waiver was knowingly and intelligently given ...

Similarly, in *Heist v. Shields,* C.A. No. 81–0736 (E.D.Pa., Final Order dated March 9, 1981), Judge Cahn of this court "permanently enjoined" state officials from entering or executing upon confessed judgments in leases unless they were accompanied by an affidavit that the lease involved commercial property and until the local court adopted rules which "will remedy the constitutional infirmities present in the confession of judgment in ejectment procedure. *See Lawson, et al. v. Coon, et al.,* (Civil Action No. 79–292, W.D.Pa., Order of Court of January 29, 1980)." In the *Lawson* Order referred to, that court incorporated an earlier preliminary injunction, entered on December 8, 1979, preventing state officials from entering or executing upon confessed judgments

until said defendant has been provided with adequate proof that (1) the defendant-tenant has been given reasonable advance notice of the intent of the plaintiff-landlord to confess judgment in ejectment, and (2) the defendant-tenant has been afforded a reasonable pre-entry-of-judgment opportunity to contest that he voluntarily and knowingly assented to the confession of judgment clause in the lease in question, and (3) that a judicial finding was made after any such contest that the tenant did voluntarily and knowingly assent to said clause; ...

Applying the foregoing reasoning to the facts at hand leads to the unmistakable conclusion that the entry of the confession of judgment against the Debtor here, and the attempt of the Movant to execute upon it, resulted and would result, respectively, in a violation of the Debtor's right to due process of law, as provided by the fourteenth amendment. The Pennsylvania statutory scheme, as of 1962 (and, we might add, today as well) contains no provision by which it can be judicially determined, prior to the entry of judgment, whether the obligor has waived his or her due process rights in executing a document containing a confession of judgment clause. Thus, the requisite means to determine whether facts comparable to the *Overmyer* situation, in which confession was held permissible, are conspicuously absent. The Pennsylvania statutory scheme allowing the entry and execution upon confessed judgments pursuant to which judgment was entered against the Debtors here is thus unconstitutional on its face, and therefore the judgment cannot be credited by us.

We should also add that the application of precepts of due process to the particular judgment against the Debtor here yields the same result. The Debtor certainly did not knowingly and intelligently waive her due process rights in signing the Demand Note in issue. Rather, she executed the Note, containing archaic and, we believe,

incomprehensible language, without counsel under extreme implicit (and perhaps explicit) duress that her failure to do so would lead to a jail term. There is no support for the principle that confession of judgment is constitutionally permissible in other than consumer transactions, even though the FTC has outlawed their use in only the consumer transactions within its jurisdiction. *Compare Piercy v. Heyison,* 565 F.2d 854 (3d Cir.1977) (constitutionality of confession signed in note in satisfaction of subrogation of tort claim questioned); *Virgin Islands National Bank, supra* (confession held unconstitutional in business transaction). *Cf. Solebury National Bank of New Hope v. Cairns,* 252 Pa.Super. 45, 48–52, 380 A.2d 1273, 1276–77 (1977); and *Egyptian Sands Real Estate, Inc. v. Polony,* 222 Pa.Super. 315, 321–22, 294 A.2d 799, 804 (1972) (Pennsylvania courts refuse to enforce confessions in business cases). Similarly, there is no logical reason why the Debtor should be subjected to the confession procedure just because the annual conjugal income of the Debtor and her husband at the time of the execution of the Demand Note may have exceeded $10,000.00.

The use of confession of judgment here also reveals starkly the consequences of allowing an ex parte judgment to be entered. The Movant entered the confessed judgment merely by producing the Demand Note to state court clerk's office personnel. The Note reflected the Movant's highest calculation of a disputed figure. It did not take into account any credits for the sale of the Debtor's home and car, or her payments. The balance due was computed by compounding the interest annually. Revival judgments were entered on balances so calculated. The amount, by this computation method, has now grown to almost five time its original size. Finally, the state courts allowed the Movant to execute upon the Debtor's home, without any attempt to examine whether the Debtor actually owed the sum demanded, or any sum at all; whether she voluntarily, knowingly, and intelligently waived her rights in the sense contemplated by the Supreme Court in *Overmyer* and *Swarb;* or whether any other Pennsylvania laws might be violated in so proceeding. As it develops, as we observe below, the process utilized here totally violated a pertinent Pennsylvania law, Act 6.

In an ex parte proceeding, all of these things can easily happen without the court's observing them. That is, of course, why the Fifth Amendment and later the Fourteenth Amendment to the remarkable document whose birthday we shall shortly celebrate provides that a party receive due process pursuant to the adversarial system before his property can be taken, and why Pennsylvania's confession of judgment procedures, both on its face and as applied here, violates those fundamental constitutional protections.

█ The emphasis placed by the Debtor upon the alleged irregularities in the process by which the confessed judgment was revived, and the Movant's responses thereto, cause us to address the impact of these revivals.

It is certainly true, as the Movant alleges, that the defenses which a judgment debtor can raise in a revival proceeding are limited to those arising since its entry and that, in some ways, a revival is a "new judgment." *See, e.g., O'Connor v. Flick,* 274 Pa. 521, 523, 118 A. 431, 432 (1922); and *Fursht v. Overdeer,* 3 W. & S. 470, 471–72 (Pa.1842); and *Pittsburgh National Bank v. Kissel,* 55 D. & C.2d 493, 495 (Washington Co.C.P.1971). Apparently, even raising the issue that the underlying judgment is an unconstitutional confessed judgment may be impermissible in defending a revival proceeding. *Atlantic Richfield Co. v. Lane,* 70 D. & C.2d 99 (York Co.C.P.1975).

However, this argument proves too much, and heightens our need for scrutiny of the constitutional issues raised by sanctioning the entry of the underlying confessed judgment at the post-revival stage. If a defendant cannot defend against the invalidity of the confessed judgment in a revival proceeding, his or her only recourse is to attack the judgment. In fact, it is hornbook law that a judgment cannot be enforced by a procedure in revival if it vio-

lates constitutional prohibitions. 20 P.L.E. 582 (1959). This conclusion is supported by the holding that *res judicata* does not protect an unconstitutional confessed judgment in *Demp v. Emerson Enterprises*, 504 F.Supp. 281, 283–84 (E.D.Pa.1980) (per GILES, J.).

Thus, since we find the "old" confessed judgment obtained against the Debtor in 1962 was unconstitutional, the "new" revived judgment which that judgment underlies is perforce unconstitutional as well, and must fall with it.

Two other issues, apart from the Debtors' invocation of the *Lucas* case, demand attention. First is the Movant's contention that the holding of *Bailey v. Bailey*, 338 Pa. 221, 223, 12 A.2d 577, 578 (1940), that interest can be recomputed whenever a judgment is *revived*, authorizes the *annual* compounding of interest utilized by the Movant in calculating the astronomical balance now allegedly owed to it by the Debtor. Nothing could be further from an accurate statement of Pennsylvania law, which, as it has been repeatedly recognized by our Court of Appeals, condemns compounding of interest as contrary to public policy. *See Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1094–95 (3d Cir.1975); and *Acker v. Provident National Bank*, 512 F.2d 729, 739–42 (3d Cir.1975). Clearly, compounding interest *annually*, rather than at the intervals of revival of the judgment, has drastically increases the balance which the Movant now claims.

This illustration reveals again the mischief of the Pennsylvania confession of judgment procedure. The state court officials entered this obviously inflated judgment of revival without scrutinizing it. Had the Movant compounded interest daily, or hourly, or conceived that the fact that the Debtor was an embezzler justified it to multiply the balance by two every year, the judgment would have been entered just the same.[3]

Secondly, although neither we nor the Debtor has raised the point at all up to this point, and therefore we treat the point as no more than an alternative holding, the Movant's attempt to execute upon the judgment in issue was totally illegal under the provisions of Act 6.

### 3. ACT 6 BARS THE MOVANT'S EFFORTS TO EXECUTE ON THE CONFESSED JUDGMENT IN ISSUE

■ We point out, *sua sponte*, probably to the surprise of both parties, that Act 6 applies to this transaction because the Movant is a "residential mortgage lender" and the Demand Note is a "residential mortgage." These observations are not apparent until the definitions of these terms contained in not only Act 6 itself, 41 P.S. § 101, but also those of its effecting Regulations, at 10 PA.CODE, § 7.2, are consulted. A "residential mortgage obligation" includes any obligation to pay a sum in a principal amount of $50,000.00 or less, secured by a lien upon residential property, evidenced by a "security document as defined in the act and this chapter." 10 PA. CODE § 7.2 (Definition of "Residential mortgage," (ii)). A "Security document" is defined, in turn, as "[a]ny document containing a confession of judgment which, when confessed, effects a lien upon real estate." *Id.* (Definition of "Security document," (ii)). *Compare In re Brennan*, 71 B.R. 706, 710 (Bankr.E.D.Pa.1987); *General Electric Credit Corp. v. Slawek*, 269 Pa.Super. 171, 409 A.2d 420 (1979); and *Lafayette Trust Bank v. JAJ Corp*, 17 Pa.D. & C.3d 256 (North Co.C.P.1980).

The application of Act 6 brings several provisions of that Act into play. First, the Movant was obliged to provide the "Notice of Intention to Foreclose" mandated by 41 P.S. § 403, to the Debtor before commencing procedures to execute on its confessed judgment. *Slawek, supra,* 269 Pa.Super. at 175–76, 409 A.2d at 424. *See also In re Schwartz*, 68 B.R. 376, 381–82 (Bankr.E.D.

---

**3.** Frankly, we question the wisdom of the *Bailey* holding, because, as no less than the Pennsylvania Department of Transportation itself pointed out in *Ralph Myers Contracting Corp. v. Commonwealth Department of Transportation,* 496

Pa. 197, 203, 436 A.2d 612, 615 (1981), this holding would allow a plaintiff to revive his judgment at very short intervals and thus achieve compounding of interest.

Pa.1986). The state court record and the silence of the Movant on this point clearly establishes that no such notice was sent here.

However, even more significant is the applicability of 41 P.S. § 407(a), which provides as follows:

§ 407. Confession of judgment

(a) As to any residential real property, a plaintiff shall not have the right to levy, execute or garnish on the basis of any judgment or decree on confession, whether by amicable action or otherwise, or on a note, bond or other instrument in writing confessing judgment until plaintiff, utilizing such procedures as may be provided in the Pennsylvania Rules of Civil Procedure, files an appropriate action and proceeds to judgment or decree against defendant as in any original action. The judgment by confession shall be changed as may be appropriate by a judgment, order or decree entered by the court in the action. After the above mentioned original action has been prosecuted and a judgment obtained, that judgment shall merge with the confessed judgment and the confessed judgment shall be conformed as to amount and execution shall be had on the confessed judgment. The parties to the action shall have the same rights as parties to other original proceedings. Nothing in this act shall prohibit a residential mortgage lender from proceeding by action in mortgage foreclosure in lieu of judgment by confession if the residential mortgage lender so desires.

This provision, on its face and as interpreted by *Slawek*, prohibits the Movant from executing upon the confessed judgment in issue unless and until the Movant files an appropriate new adversarial action and obtains a judgment in such an action, as opposed to utilization of the confessed judgment as the basis for execution, as the Movant was purporting to do in November, 1986, in the state court confession of judgment action began in 1962.

We therefore observe that the Movant's course of action here was violative of Pennsylvania law, as well as the federal constitution. Furthermore, the mischief of the ex parte nature of the Pennsylvania confession of judgment procedure is again graphically illustrated. Since the procedure prevents scrutiny of the legality of the transaction pursuant to state law, state law can be and was trampled upon unnoticed.

4. WE DO NOT DECIDE BUT ACKNOWLEDGE THAT A SUBSTANTIAL QUESTION IS PRESENTED BY THE DEBTOR'S CONTENTION THAT THE MOVANT'S EFFORTS TO REVIVE THE JUDGMENT HERE WERE DEFECTIVE

The Debtor's principal argument, as is noted above, is an attempt to apply the holding of *Lucas, supra,* to the instant facts. The Debtor emphasizes that the Docket Entries do not include an entry of the revived judgment in 1985. The Movant counters by producing a document certified from the record (but inexplicably omitted from citation on the Docket Entries) which has stamped upon it a notations indicating that it "has been indexed." The Movant attaches to its Brief (but did not enter into evidence on this record) a certified copy of a portion of the judgment index indicating that the judgment has in fact been indexed.

What appears to us to be missing is any documentation indicating the entry of the judgment itself. The Praecipe, as noted at Finding of Fact 14, contains, at the bottom, the *phrase* that judgment is entered, obviously typed in as a proposed order, but no signature under it verifying that the order has been entered. The notation on the Praecipe and the judgment index appear to establish that the state court officials *thought* that they had properly entered the judgment of revival. However, the absence of any document expressly so stating *and* the lack of a Docket Entry to this effect raise a considerable question in our mind as to whether the judgment in the revival was actually entered.

We must observe that the Movant has shown far more than the creditors in *Lucas* in establishing that the judgment may have been properly revived. Also, although the Movant has not raised the issue, we have

some doubt about the accuracy of Judge Goldhaber's implicit holding in *Lucas* that an improper revival would in fact render an execution *qua* the judgment debtor defective. Thus, we do not believe that we could decisively rule in favor of the Debtor on this point, making our foregoing trek through the constitutional issue necessary. We therefore shall merely hold, on this issue, that we have considerable doubt as to whether the revival of the judgment, assuming *arguendo* its validity, was properly accomplished.

## 5. THE EQUITIES FAVOR THE DENIAL OF THE MOTION

■ As a Motion for relief from the automatic stay is an equitable proceeding, we feel compelled to comment upon the equities of the parties. We do not condone the Debtor's embezzlement of undoubtedly a very significant sum, certainly by 1950's standards, from the Movant. However, we note that the Debtor and her husband gave up their home and their car and made substantial payments to the Movant. The Debtor has been visited with the consequences of her acts for over thirty years. The Movant now seeks to sell the Debtor's home, which its own evidence indicates contains an equity of over $60,000.00.

We acknowledge the Old Testament biblical principle that one should be faced with the loss in kind of whatever is taken, *e.g.*, "[e]ye for eye, tooth for tooth, hand for hand, foot for foot." *Exodus*, 21:24. Here, however, the Movant is, figuratively speaking, taking an arm and a leg to compensate it for the loss of a tooth. This appears contrary to the aforesaid teaching, which was to discourage escalation of retaliation in response to suffered wrongs. Moreover, we observe that, in the New Testament, Jesus Christ suggests, in the Sermon on the Mount, that even that principle be cast aside. *St. Matthew*, 5:38–42.

We find few equities in favor of the Movant, especially since it laid in wait to pounce in ambush for over twenty-five years, while the Debtor liquidated much of her mortgage. Thus, the equities, as well as the law, do not run in the Movant's favor.

## 6. CONCLUSION

The defenses raised here are viable defenses to the Motion, because they leave the Movant with only a claim which is not supported by any valid state court judgment, and which cannot in any event be the basis for valid execution against the property of the Debtor's estate. The Movant therefore presents itself as a general unsecured creditor, which has failed to prove any circumstances which tip the balance of hardships in its favor and would support a finding of cause such as would justify our granting it relief under 11 U.S.C. § 362(d)(1). *See In re Ronald Perlstein Enterprises, Inc.*, 70 B.R. 1005, 1009–10 (Bankr.E.D.Pa.1987); and *In re Stranahan Gear Co.*, 67 B.R. 834, 837–38 (Bankr.E.D. Pa.1986).

We shall therefore enter an accompanying Order denying the Movant the relief which it seeks.

### ORDER

AND NOW, this 10th day of June, 1987, upon consideration of the Motion of JAMES D. MORRISSEY, INC. (hereinafter referred to as "the Movant") for a Modification of the Automatic Stay Provisions of Section 362(a) under Sections 362(d) and (e) and Section 105(a), the record made at the hearing on March 24, 1987, and the Briefs of the parties, it is hereby

ORDERED that the Motion is DENIED.