In re Robert P. FRICKER & Dolores A. Fricker, Debtors.

Robert P. & Dolores A. FRICKER, Plaintiffs,

v.

FIRST PENNSYLVANIA BANK, N.A., Meridian Bank (Successor to Central Penn National Bank), Fidelity Bank, N.A., Hamilton Bank, Acceptance Associates of America, Inc., Herman Neumann, Frank P. Lalley, in his capacity as Sheriff of Montgomery County, and Meritor Savings Bank, Defendants.

Bankruptcy No. 89–11904S.
Adv. No. 89–0704S.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 5, 1990.

---

Mark Kravitz, David M. Still, Norristown, Pa., for debtors.

Stephen Raslavich, Philadelphia, Pa., for Acceptance Associates of America, Inc. and "line banks".

Ross Weiss, Elkins Park, Pa., for Frank P. Lalley, in his capacity as Sheriff of Montgomery County.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Joel Friedman, Media, Pa., for Herman Neumann.

Ellen McDowell, Philadelphia, Pa., for Meritor Sav. Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

After a seemingly interminable series of preliminary skirmishes, the instant adver-

sary proceeding, in which the Debtors mount a broadside attack on not only a sheriff's sale of their home but also the legality of the underlying obligation default of which was the basis of that sale, is ready for disposition. As we indicated throughout the course of these proceedings, the sheriff's sale, based on a confessed judgment, cannot stand in light of 41 P.S. § 407(a) and the constitutional deficiencies in the Pennsylvania confession of judgment procedures, the inequities of which are again brought home by the instant factual pattern. As we also indicated to the parties, the determination of the rights of the judgment creditor who sold the home cannot be determined with finality until the process of assessing its claims in light of the invalidation of the sheriff's sale occurs. However, we are able to draw several legal conclusions about the Debtors' claims relevant to the underlying obligation: (1) It is a commercial or business transaction, beyond the scope of the federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* (hereinafter referred to as "TILA"), and most of the regulatory provisions of Pennsylvania Act 6 of 1974, 41 P.S. § 101 *et seq.* ("Act 6"); and (2) Certain elements of damages sought by the Plaintiffs (loss of bargain of selling a property adjacent to their home and cashing in savings accounts due to pressure by the creditor) must be rejected; (3) However, their claims that the transaction is violative of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* (hereinafter cited by its general description as a law regulating unfair and deceptive acts and practices, "UDAP"), appear to have merit, particularly since the practices of the creditor are closely related to those prohibited under the Pennsylvania Debt Pooling Act, 18 Pa.C.S. § 7312 ("DPA").

## B. PROCEDURAL HISTORY

The joint Chapter 13 bankruptcy case underlying this proceeding was filed by ROBERT P. FRICKER and DOLORES A. FRICKER ("the Debtors") on May 24, 1989. The first contested matter relevant to this proceeding was a motion filed by Defendant HERMAN NEUMANN ("Neumann"), the purchaser of the Debtors' residential realty situated at 936 Welsh Road, Huntingdon Valley, Montgomery County, Pennsylvania ("the Home") at a Montgomery County sheriff's sale of April 19, 1989, for a price of $75,000. When the Debtors failed to answer or appear at a hearing of July 6, 1989, conducted by the Honorable Bruce Fox in our absence, Judge Fox entered an Order that day granting relief.

On June 29, 1989, Defendant ACCEPTANCE ASSOCIATES OF AMERICA, INC. ("AAA"), the creditor whose judgment was the basis of the April 19, 1989, sale, filed a motion to dismiss or convert the case to Chapter 7 or obtain relief from the automatic stay in reference to the Home. After a hearing of July 27, 1989, we entered an Order denying the motion to dismiss or convert, declaring the hearing on the stay-relief motion to be a preliminary hearing, and, finding cause therefor, continuing the stay in effect pending a final hearing and a trial on a planned adversary proceeding to be filed by the Debtors attacking the April 19, 1989, sheriff's sale of the Home on August 10, 1989, also the date of a hearing on the Debtor's motion to reconsider the Order of July 6, 1989, on Neumann's motion. The Complaint was to be filed and served on or before July 31, 1989.

At the August 10, 1989, hearing, it became apparent that the Debtors' counsel had not filed and served the anticipated Complaint by July 31, 1989, and was not prepared for trial, pursuant to our directives. After a lengthy colloquy with counsel, we entered an Order and Pre–Trial Order of August 14, 1989, in which we provided the Debtors with a requested extended period to file an Amended Complaint, scheduling the trial on November 7, 1989. However, due to their failure to comply with our Order of July 27, 1989, and in consideration for giving the Debtors such a long time-period to prepare their Amended Complaint, we granted AAA's motion for relief from the stay and reaffirmed Judge Fox's Order granting Neumann relief on the merits.

In response to the Debtors' Amended Complaint, Neumann filed an Answer

contending, *inter alia*, that the Standing Chapter 13 Trustee, Edward Sparkman, Esquire ("the Trustee"), was an indispensable party. AAA and the "line banks" of the loan from AAA, Defendants FIRST PENNSYLVANIA BANK, N.A., MERIDIAN BANK, FIDELITY BANK, N.A., and HAMILTON BANK,[1] not only filed an Answer, but demanded a jury trial. Also, the Debtors moved for reconsideration of several aspects of the August 7, 1989, Order. These matters led to a hearing of September 21, 1989, in a colloquy at which the Trustee participated and expressed his intention to not become involved in this proceeding but to nevertheless be bound by the disposition achieved by the Debtors;[2] the Debtors' motion was denied; and the parties were accorded until October 5, 1989, to brief the jury trial issue. When no briefs on this issue were in fact submitted, we ultimately entered an Order of October 23, 1989, striking AAA's jury demand on the ground that the primary relief sought by the Debtors was equitable in nature and that the second "prong" of the three-prong test set forth in *Granfinanciera v. Nordberg*, —— U.S. ——, 109 S.Ct. 2782, 2793–94, 106 L.Ed.2d 26 (1989), *see In re Light Foundry Associates, Light Foundry Associates v. Alter*, 112 B.R. 134, 136–137 (Bankr.E.D.Pa.1990), was not satisfied. We also reiterated that the parties should strictly conform to our Order of August 14, 1989, requiring, *inter alia*, exchanges of exhibits on or before October 27, 1989, and completion of a Stipulation of undisputed facts and pre-trial Briefs on or before October 31, 1989.

Despite these admonitions, on November 6, 1989, the Debtors' counsel advised that he had not complied with our Order and sought eleventh-hour dispensations. After a conference call in which the Defendants' various counsel unanimously expressed a willingness to proceed the next day despite the lack of submissions from the Debtors' counsel, we went forward. We did ultimately impose a $100 sanction upon the Debtors' counsel in an Order of November 21, 1989, the mildness of the sanction being attributable to his attempts to belatedly comply with our directives thereafter.

The trial was completed on two days, November 7, 1989, and November 17, 1989. A request for a transcript and slightly-tardy submissions of several Briefs delayed the submission of the proceeding to us until March 22, 1990. Since it is an adversary proceeding, we are obliged, pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), to submit our decision in the form of Findings of Fact and Conclusions of Law. The latter will be presented as headnotes for the discussions which follows.

## C. FINDINGS OF FACT

1. The Debtors are a married couple in their mid–40's, both of whom have graduated from high school, and both of whom are employed as supervisors by the Smith, Kline, and French Co. ("SKF"), earning a combined annual salary of about $74,000 from SKF. In addition, they own a corporation known as Brutus, Inc. ("Brutus"), which operates a delicatessen known as Corned Beef Junction ("CBJ") from realty owned by Brutus at 143 East Wyoming Avenue, Philadelphia. The Husband–Debtor spends most of his time away from his employment at SKF serving as a proprietor at CBJ. ·

2. On November 16, 1978, the Debtors purchased the Home, giving MERITOR SAVINGS BANK ("Meritor") a first mortgage on the Home in the principal amount of $38,400. The Debtors have continuously resided in the Home since its purchase, and now reside there their two youngest chil-

---

1. The business of AAA is advancing funds to customers on loans made from banks, whom AAA repays as it is repaid by its customers. The banks funding AAA, or giving it a line of credit, as to any particular transaction, are its "line banks." We find that the Debtors have no cause of action against the "line banks" in the instant transaction.

2. The Trustee's waiver of any claim of the estate over and above that which the Debtors are able to achieve renders the empty formality of joining the Trustee as a party unnecessary. *See Smith v. State Farm Fire & Casualty Co.*, 633 F.2d 401, 405 (5th Cir.1980: and *In re Dinkins*, 79 B.R. 253, 258 (Bankr.E.D.Pa.1987).

dren, aged 11 and 17 years, and the Husband's 83–year–old mother. They also are parents of two children who attend college and a 24–year–old unmarried daughter living elsewhere who previously attended college.

3. As of April, 1985, the Debtors also owned an adjacent home and lot at 900 Welsh Road ("the 900 Property"), on which a balance of a purchase-money mortgage to Pitcairn, Inc. ("Pitcairn") of about $60,000 remained. As of that date, Brutus owned its place of business, which was encumbered by a purchase-money mortgage of about $3,000 to one Dean Boyer ("Boyer"), and about $32,000 owed to Security Pacific Consumer Discount Co. ("Security") on a business loan. The Debtors testified that, while the 900 Property was being rented to friends, it was their intention to make the home available as a residence for the first of their daughters who married.

4. At that time, Pitcairn indicated that, pursuant to an oral understanding which it had with the Debtors, it wished to be paid off. The Debtors therefore approached Bay Associates ("Bay"), a loan broker, to attempt to obtain a loan. As a result, Bay completed an unsigned Loan Application of April 30, 1985, in which the purpose of the loan was recited as "pay off business loans/working capital $12,000," and the Pitcairn, Boyer, and Security loans were recited as "to be paid off."

5. The Debtors both testified that they were only being pressed on the Pitcairn loan, and that the impetus for obtaining a loan to pay off Brutus' indebtednesses and obtain additional working capital came from Bay.

6. On May 9, 1985, AAA sent a commitment letter to the Debtors indicating a willingness to make a loan to Brutus for $120,000, at nine (9%) percent over prime, for a term of fifteen (15) years "with a three (3) year balloon period" to be paid from submission of 36 post-dated checks of $2,230.17 each. AAA was to charge a $7,700 "placement fee," of which a $1,200 "acceptance fee" was due by May 30, 1985. The Debtors accepted this commitment on May 14, 1985.

7. The record contains a "statement" which identifies May 30, 1985, identified as the date of settlement and which contains certain written-over and only partially legible figures which appear to be as follows:

| | |
|---|---|
| Placement Fee to AAA | $ 6,500.00 |
| Legal Fee— | |
| Jonathan DeYoung, Esq. | 1,250.00 |
| Boyer | 3,000.00 |
| Pitcairn | 60,780.00 |
| Security | 31,094.16 |
| Bay | 12,000.00 |
| (Various title Company charges) | 1,297.00 |
| Balance Due to Brutus | 14,278.00 |
| TOTAL | $130,199.16 |

(The Total on this "statement" is $129,700; the discrepancy is probably attributable to our inability to read some of the numbers accurately).

8. Settlement of the transaction occurred in "less than an hour" according to the Debtors, who were not represented in the transaction by counsel other than DeYoung, on July 1, 1985. At that time, the Debtors, individually and on behalf of Brutus, executed an Installment Note; on behalf of Brutus, executed a Security Agreement giving AAA security on Brutus's real estate, equipment, and inventory; and, individually, executed mortgages on both Welsh Road properties. The significant terms of the Installment Note, most of which appear verbatim in the Mortgage, read, in pertinent part, as follows:

[The Debtors and Brutus] promise to pay [AAA] ... $129,700.00 ... bearing interest at 19.5% annum which is 9% above prime as determined by First Pennsylvania Bank. This rate shall be adjusted every six ... months.

Said payment will be made in ... 180 ... monthly installments of $2,230.17 each, creating a gross obligation of $401,430.60 principal and interest. This gross obligation is stated as though the initial interest rate will be the interest rate throughout the contract, although, in fact, the balance will change as the rate changes.

The first installment is payable on August 1, 1985, and the remaining installments on the same date of each month thereafter until maturity. Borrower acknowledges that the monthly payment will be adjusted as the interest rate is adjusted. The monthly payment herein described is for a term of ... 180 ... months; however, it is agreed and under-

stood by both the Borrowers and the Lender that the entire balance shall become due and payable ... 36 ... months hence. This term and condition herein stated is commonly referred to as a "balloon payment".

. . . . .

... In the event of default, Borrower shall be obligated to repay the debt as computed under the accounting principle known as "one-half the Rule of 78's Method."

And, further, for value received, the undersigned corporation and each and every guarantor does hereby authorize and empower the Prothonotary, Clerk of Court or any Attorney of any Court of Record in Pennsylvania, or elsewhere, to appear for and to confess judgment, against the undersigned for the undersigned for the above sum, as of any term, past, present or future, with or without declaration, with costs of suit, release of errors, without stay of execution and with twenty percent (20%) added for collection fees; ...

9. The Debtors both testified that they believed that the parties' loan agreement ran unconditionally for fifteen (15) years, and that they were unaware of and unfamiliar with the meaning of the term "balloon payment." The Husband–Debtor also testified that he was unaware of and unfamiliar with the meaning of the last above-quoted clause, the "confession of judgment" clause.

10. AAA's records appear to indicate that, although the Debtors presented several checks which were returned for insufficient funds, payments of $2,230.17 were made in each of the eighteen (18) months through January, 1987 (a total of payments of $40,143.06). Thereafter, through December 1, 1987, it appears that only one regular payment was made and payments totalling $9,000, mostly in the amount of $600 paid bi-monthly, were made (making the total of payments, as of December 1, 1987, $51,373.23).

11. On September 2, 1987, David I. Davis, Esquire ("Davis"), a partner in the Jonathan DeYoung law firm, filed papers on behalf of AAA in the Court of Common Pleas of Montgomery County, Case No. 87–12853, which resulted in the entry of a confessed judgment in favor of AAA against the Debtors.

12. In December, 1987, Howard Palmieri ("Palmieri"), an employee of AAA, called the Husband–Debtor and stated that the 900 Property would be sold at a sheriff's sale unless the Debtors cured the delinquency.

13. The Debtors testified that, because of their fear that they would lose the 900 Property entirely unless they made a payment to AAA promptly, they sold the 900 Property to a party with readily-available cash for $90,000. However, they indicated that the tenants residing at that property had offered them $125,000 for the property and that, if the Debtors had been given additional time, they would have been able to consummate a sale for this amount. However, they did not inform AAA of the tenants' offer. They did remit to AAA their entire net sale proceeds of the 900 Property of $77,525.59 in December, 1987.

14. At some indeterminate period, possibly in 1987 or 1988, the Debtors cashed in savings accounts at SKF of about $15,000 each to try to keep up payments to AAA and Meritor's mortgage. However, due to a need to finance the operation of Brutus's business, they were unable to remain current on either obligation. After the sale of the 900 Property, in December, 1987, through March 1, 1989, they remitted only two additional payments, totalling $4,430.17, to AAA, rending the total amount remitted, as of that date, at $133,328.99.

15. In July, 1988, Davis filed papers necessary to assess damages of AAA at $203,302.46 in the confession of judgment action. At that time, AAA's records showed a "gross balance" of $275,456.79, and a "net balance" of $54,685.91 due to it from the Debtors. Those records presently show a "gross balance" of $266,256.60 and a "net balance" of $53,311.44 due from the Debtors.

16. AAA filed a writ of execution to sell the Home pursuant to the confessed judgment in July, 1988, and a sheriff's sale of

the Home was scheduled on March 22, 1989. Davis spoke to the Wife–Debtor prior to the sale and, upon her payment of $7,000 (bringing the payment total to $140,328.99), he stayed the sale until April 19, 1989. However, Davis further stated that, unless $3,000 more were paid and an allegedly-pending agreement of Brutus to sell its assets was not executed by that date, the Home would be sold on April 19, 1989.

17. The Debtors made no further payments. The Home was sold to Neumann at the sheriff's sale for $75,000 which, despite the amount of the judgment, was agreed by AAA to be a sufficient payment to satisfy its real debt.

18. The Debtors still claim to have a prospective purchaser of Brutus' assets for $90,000, but no agreement of sale has materialized despite repeated assurances of the firmness of this deal by the Debtors. The Debtors testified that, at the time of trial, they were twenty (20) months delinquent in their payments to Meritor on its first mortgage on the Home.

19. The Debtors made an offer of proof to call Bruce I. Newman, a real estate appraiser, to testify that the fair market value of the Home at the time of the sheriff's sale was $190,000. Because all parties conceded that this court would proceed to set aside the sheriff's sale on other grounds without the need for testimony as to the value of the Home, which could make out a case for setting aside the sale under 11 U.S.C. § 548(a)(2), the court declined to accept Newman's testimony on this issue.

20. Salvatore Bello ("Bello"), the Defendant's president and owner of sixty (60%) percent of its stock, testified that Jonathan DeYoung owns about fifteen (15%) percent of the stock of AAA. He also testified that DeYoung owns the building which houses both his law firm and AAA. Further, Bello stated that his company makes only commercial loans. When asked how the relationship between the "gross balance" and "net balance" in the instant loan was established, Bello testified that it has some relationship to the reference in the loan papers to the Rule of 78's, which the court was unable to follow. Bello also stated that,

while the terms of the loan transaction authorized AAA to demand a balloon payment after three years, it also could and frequently did continue to hold paper in similar transactions for the entire term on which the finance charges were calculated.

21. Palmieri, though an experienced loan company employee, could not explain the Rule of 78's nor its relationship to the loan balance. AAA's counsel has not provided any explanation of the calculation of same. We find several aspects of AAA's business—including the inscrutable terms of this loan, the exorbitant rate of interest, the practice of demanding pre-paid postdated checks, and its ready use of confession of judgment—indicative of sharp and abusive lending tactics.

22. Davis was called as an adverse witness by the Debtors. He expressed a belief that his use of confession of judgment was proper despite the existence of Act 6, and he generally attempted to distance himself from personal involvement in the transaction, even though his law partner is a part owner and the landlord of AAA.

23. The Debtors, particularly the Husband–Debtor, presented themselves as hard-working individuals who, despite their modest business venture, were unsophisticated in financial transactions and legal matters. We credit totally their testimony that they believed that the loan from AAA extended for fifteen (15) years and that they were totally unaware of the existence and effect of confession of judgment clauses in their loan documents. We do question the ability of the Wife–Debtor to perform her delegated responsibility as the family's financial manager, noting, with particular dismay, her filing, without telling her husband, of a previous individual Chapter 13 bankruptcy case which was dismissed when necessary payments were not made.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. THIS COURT HAS JURISDICTION TO HEAR AND DECIDE THIS PROCEEDING.

■ As a court of limited jurisdiction, we are obliged to determine the propriety of

our jurisdiction to hear and determine a matter presented to us, despite the failure of any of the parties to raise the issue. *See In re Greenley Energy Holdings of PA, Inc.,* 110 B.R. 173, 179–80 (Bankr.E.D. Pa.1990).

■ An action in which a debtor seeks to set aside a pre-petition sale of valuable property which, if set aside, would clearly be property of the debtor's estate, should generally be considered as not only a matter related to the debtor's bankruptcy case, but also may well be a core proceeding under 28 U.S.C. §§ 157(b)(2)(E), (b)(2)(F), (b)(2)(H), (b)(2)(M), (b)(2)(N), or (b)(2)(O). As 11 U.S.C. § 548(a)(2) is pleaded as a specific substantive ground for relief, § 157(b)(2)(H) is directly implicated. Clearly, § 157(b)(2)(F) could have been invoked, although it was not. We believe that §§ 157(b)(2)(E) and (b)(2)(O) are rather clearly applicable to all of the claims asserted by the Debtors.

Our only question is whether, since we have granted both AAA and Neumann relief from the automatic stay, the controversy should be relegated to the state courts. *See In re Incor, Inc.,* 100 B.R. 790, 796 (Bankr.D.Md.1989); and *In re Young,* 76 B.R. 504, 506–07 (Bankr.E.D.Pa.1987).

■ We refuse to reach that result for several reasons. First, a creditor's obtaining relief from the automatic stay as to certain property does not remove it from the category of property of the estate. *See In re Foster,* 105 B.R. 746, 748 (Bankr.M. D.Ga.1989); *In re Ridgemont Apartment Associates,* 105 B.R. 738, 741–42 (Bankr.N. D.Ga.1989); and *In re Hood,* 92 B.R. 648, 651 (Bankr.E.D.Va.1988). Secondly, relief from the stay was granted to AAA and was granted on the merits to Neumann only *after* this proceeding was instituted. In fact, the relief was granted only as a trade-off for indulging the Debtors' desire to delay this proceeding by taking a considerable period to file an Amended Complaint.

■ Therefore, while we believe that granting relief from the stay as to certain property normally diminishes significantly the estate's interest in that property, as a result of which a bankruptcy court, in most circumstances, should decline to intervene with post-stay-relief proceedings, we do not believe that granting relief from the stay deprives a bankruptcy court of jurisdiction over that property. In the instant factual matrix, we have been aware, even at the time we granted relief from the stay and to the present, that the property in issue, the Debtors' Home, is of great significance to their estate. We will therefore proceed to hear and determine this core proceeding, *see* 28 U.S.C. § 157(b)(1), even though we granted relief from the automatic stay to the two principal defendants as to the property which the Debtors seek to recover in this proceeding.

## 2. THE SALE OF THE HOME MUST BE SET ASIDE.

Counsel for the Defendants acknowledged, before the trial began, that the sheriff's sale of the Home, based upon a confessed judgment, would be set aside if this court followed its prior decisions in *In re Jackson,* 92 B.R. 987, 996–97 (Bankr.E.D. Pa.1988); and *In re Souders,* 75 B.R. 427, 433–39 (Bankr.E.D.Pa.1987). Not surprisingly, we choose to follow these decisions, observing that the facts of the instant proceeding reinforce once again the need for judicial oversight which the unfettered use of confessed judgments obfuscates.

■ In *Souders,* we held that, inasmuch as the Pennsylvania procedures permitting the use of confessed judgments fail to provide a procedure by which the legal validity of an obligor's waiver of due process effected by the execution of a document containing a confession of judgment clause can be tested, they are violative of due process. *Id.* at 436. We further observe, as we did in *Souders,* that we have no hesitancy in concluding that the particular Debtor-obligors before us here neither voluntarily, knowingly, nor intelligently waived their due process rights. *Id.* at 436–37. While the Debtors were not subject to the same degree of coercion as the *Souders* debtor and are somewhat better educated than the *Souders* debtor, they are clearly members

of the large majority of persons whose lack of legal sophistication places awareness of the impact and consequences of confession of judgment beyond their wildest imaginings. Certainly, they are a far cry from the sophisticated debtor who bargained for a confession of judgment clause in *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 182–83, 92 S.Ct. 775, 780–81, 31 L.Ed.2d 124 (1972).

■ However, as in *Souders*, a narrower, state-law statutory ground upon which to strike the particular confessed judgment in issue arises from application of 41 P.S. § 407(a) of Act 6, which bars the use of a confessed judgment as a basis for an execution sale "[a]s to any residential real property" in the Commonwealth. *Id.* at 438–39.

In *Jackson, supra*, we had occasion to consider whether 41 P.S. § 407(a) applies to transactions which involve documents containing an obligation in excess of $50,000 and hence not within the Act 6 definition of a "residential mortgage." 41 P.S. § 101 (definition of "Residential mortgage"). We did not reach this issue in *Souders* because the obligation in issue there was in an amount of less than $50,000, and hence was a "residential mortgage." In *Jackson*, 92 B.R. at 997, we held that, in light of the distinct definitions given to the terms "residential mortgage" and "residential real property," the $50,000 limit in the former could not be read into the latter. We pointed out that this conclusion was consistent with our observations in *In re Jungkurth*, 74 B.R. 323, 329–31 (Bankr.E.D.Pa.1987), *aff'd*, 87 B.R. 333 (E.D.Pa.1988), that some portions of Act 6 may be applicable to certain transactions, even though other portions of the Act are not.

Therefore, to determine whether the proscription of use of confessed judgments as a basis for execution provided in § 407(a) applies, we must ascertain only whether the property subject to execution contains not more than two residential units or is one upon which not more than two residential units are planned to be constructed. See 41 P.S. § 101 (definition of "Residential real property"). The Home, containing but one residential unit, satisfies this definition. Therefore, AAA's use of confession of judgment as a basis for the sheriff's sale in issue is barred by § 407(a) and the sheriff's sale of April 19, 1989, must be set aside on this ground.

■ Neumann has expressed a possible intention to appeal this result on the ground that both *Souders* and *Jackson* were wrongly decided. However, a reversal of the holdings of both of these cases would merely mean that the testimony which we refused to hear because of the clear presence of alternative grounds for our decision would have to be adduced on the issue of whether the sheriff's sale could be set aside on the basis of 11 U.S.C. § 548(a)(2). Newmann's bid price of $75,000 was well below the benchmark of seventy (70%) percent of the Home's value of $190,000. *See, e.g., In re Orsa Associates*, 99 B.R. 609, 615–18 (Bankr.E.D.Pa.1989) ("*Orsa I*"); *In re Cole*, 81 B.R. 326, 329–31 (Bankr.E.D.Pa.1988); and *In re Corbett*, 80 B.R. 32, 37 (Bankr.E.D.Pa.1987). *But see In re Littleton*, 888 F.2d 90, 92–94 (11th Cir.1989); and *In re Brasby*, 109 B.R. 113, 120–25 (Bankr.E.D.Pa.1990) (seventy (70%) percent benchmark may not be applicable to foreclosure sales by second mortgagees); and *Barrett v. Commonwealth Federal Savings & Loan Ass'n*, 111 B.R. 78, 81–82 (E.D.Pa.1990) (seventy (70%) percent rule should not be applied mechanically in any circumstances; "relevant factors" of encouragement of competitive bidding, advertisement of sale, and arm's length relationship of bidder to creditor must be considered). It is misleading for Neumann to argue, as he does in his Brief, that the Debtors did not meet their burdens of proof under § 548(a)(2). They would clearly be entitled to do so on remand if our decision on the basis of both the unconstitutionality of AAA's confessed judgment and the applicability of § 407(a) were reversed.[3]

3. We totally reject the assertion by Neumann that setting aside the instant sale is contrary to established principles of Pennsylvania law. While no discrete state law may support this

We also note that, if our decision were reversed, we would have to consider the validity of AAA's underlying claim in more depth at this juncture, and it is not clear that we would conclude that AAA's rights support the judgment and sheriff's sale. *See* pages 868–73 *infra.* However, concluding as we do that the use of confession of judgment and the presence of § 407(a) are sufficient to justify invalidation of the sheriff's sale, we need decide only some of the issues concerning AAA's rights at this juncture.

3. THE UNDERLYING TRANSACTION IN ISSUE APPEARS TO BE A "BUSINESS LOAN" FOR PURPOSES OF BOTH THE TILA AND ACT 6.

■ The issues raised in their proceeding are in many ways reminiscent of those presented in *Orsa I, supra.* There, we proceeded to set aside an attempt by a creditor in a business transaction to effect the seizure of the debtors' properties without resort to any adversarial procedures, albeit mainly on the basis of § 548(a)(2). *See* 99 B.R. at 615–18. Considerable evidence had been presented by the debtors relative to the underlying transaction, and the debtors, like the instant Debtors, sought to invalidate the underlying loan in the same adversary proceeding in which the transfer of the debtors' properties were set aside. Nevertheless, we refused to rule on the validity and extent of the creditor's lien under 11 U.S.C. § 548(c) at that point because we believed that it was unfair to all interested parties to focus on this issue until after the transfer had been definitely set aside. *Id.* at 618. *Accord, Cole, supra,* 81 B.R. at 338–39; and *Corbett, supra,* 80 B.R. at 38. Instead, we relegated the issue of the size and character of the creditor's lien to the claims process. *Orsa I,* 99 B.R. at 618, 622, 624. Ultimately, we incorporated the record made in the adver-

sary proceeding in ruling on the extent and type of the creditor's claim in the claims process. *See In re Orsa Associates, Inc.,* 106 B.R. 418, 419–21 (Bankr.E.D.Pa.1989) ("*Orsa II*").

We are inclined to take the same approach here. We will therefore refrain from ruling on the extent and status of any potential claim of AAA and Neumann against the Debtors and require them to resort to the claims process to resolve this issue. We can, however, provide guideposts which we hope will encourage the parties to resolve this issue without the necessity for further litigation. *But see id.* at 419.

■ A contention which pervades the Debtors' Amended Complaint and Brief is that the transaction of July 1, 1985, was a consumer transaction within the scope of the TILA and portions of Act 6 other than 41 P.S. § 407(a). A finding that this transaction was a consumer loan would be significant, not only in allowing the Debtors to invoke the specific penalties of the TILA, but because the transaction would be subject to be deemed usurious under 41 P.S. §§ 501–07, which would open a Pandora's box of remedies to the Debtors. *See generally In re Stewart,* 93 B.R. 878, 882–87 (Bankr.E.D.Pa.1988). However, although we agree that the instant transaction, like the transaction in *Stewart, id.* at 879, allows us to traverse the dark side of a marketplace, we find that the particular marketplace which is relevant here is that of small business loans, not consumer loans.

The Debtors argue that the instant transaction is not a credit transaction "primarily for business, ... purposes," an exception from the application of the TILA. 15 U.S.C. § 1603(1). However, it must be recalled that, of the proceeds obtained by the Debtors in the transaction, over $34,000 went towards liquidation of Brutus' debt, over $14,000 went directly towards Brutus'

---

relief, *see In re Frascatore,* 98 B.R. 710, 719–20 (Bankr.E.D.Pa.1989), the dictates of applicable federal law, 11 U.S.C. § 548(a)(2), would obviously be supreme. Furthermore, Pennsylvania law clearly supports the principle that a sheriff's sale based on a void judgment, which we sug-

gest is a proper characterization of a judgment entered in violation of constitutional principles and state law, must be set aside. *See Harris v. Harris,* 428 Pa. 473, 474–75, 239 A.2d 783, 785 (1968).

operations, and the remaining amount of just over $60,000 went towards liquidation of the Pitcairn mortgage on the 900 Property.

The determination of whether a certain transaction is business or consumer credit is addressed in detail in the Official Staff Commentary on Regulation Z Truth in Lending ("the Commentary"), § 226.3(a). Five factors are to be weighed:

- The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.
- The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.
- The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.
- The size of the transaction. The larger the transaction, the more likely it is to be business purpose.
- The borrower's statement of purpose for the loan.

*Id.*, § 226.3(a)2.

Even more relevant to the instant factual matrix is the following passage at *id.*, § 226.3(a)3:

3. *Non-owner-occupied rental property.* Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes....

The latter passage avoids the necessity for us to engage in an almost evenly balanced weighing process of funds devoted to Brutus's activities, which are clearly business-related, against those devoted to the 900 Property. *See In re Klutzaritz,* 46 B.R. 368, 370 (Bankr.E.D.Pa.1985) (loan in which over sixty (60%) percent of its proceeds were used for business purposes was found to be a business loan). This passage makes clear that the expenditure of funds towards the 900 Property, which has never been owner-occupied by the Debtors, must also be considered as an expenditure "for business purposes." *Compare Adema v. Great Northern Development Co.,* 374 F.Supp. 318, 319 (N.D.Ga.1973) (purchase of lots as an investment is not a consumer loan); *Puckett v. Georgia Homes, Inc.,* 369 F.Supp. 614, 619 (D.S.C.1974) (purchase of mobile home to replace that of tenant of borrower which had been destroyed is not a consumer loan); and *Sapenter v. Dreyco, Inc.,* 326 F.Supp. 871, 873 (E.D.La.), *aff'd,* 450 F.2d 941 (5th Cir.1971), *cert. denied,* 406 U.S. 920, 92 S.Ct. 1775, 32 L.Ed.2d 120 (1972) (cash used to make payments on an investment property is not a consumer loan), *with Tower v. Moss,* 625 F.2d 1161, 1166–67 (5th Cir.1980) (loan of a borrower presently living in apartment for repairs to her intended home is a consumer loan); and *Greene v. Gibraltar Mortgage Investment Corp.,* 488 F.Supp. 177, 178–79 (D.D.C. 1980) (loan by a borrower to repair her residence, though designated as made for the purpose of converting the home into a rooming house, is a consumer loan).

Even if the 900 Property had been retained by the Debtors to be used as a home for one of their children, a recitation which we credit, we find that the Debtors could not, for that reason, establish that the 900 Property was "owner-occupied" under the terms of § 226.3(a)3 of the Commentary. Therefore, all of the loan proceeds were devoted to what must be determined to be "business purposes" under TILA, and TILA must be deemed not applicable to this transaction.

■ The conclusion that the loan in issue was for a "business purpose" under the TILA does not foreclose a different result under Act 6. In *Jungkurth, supra,* 74 B.R. at 330–31, we considered, at some length, Act 6's "business loan" exception to the interest-rate limitations set forth in 41 P.S. § 301(b) in what would otherwise be a "residential mortgage" obligation within the scope of § 301(b). That exception appears in 41 P.S. § 301(f)(v) and excepts "business loans the principal of which is in excess of ten thousand dollars ($10,000)" from the maximum interest rate and other restrictions set forth in § 301. We noted that the applicable Regulations, at 10 PA. CODE § 7.2 (definition of "Business

loans"), flesh out definition of "business loans" as follows:

Unless the context indicates otherwise, the following definitions and rules of construction apply:

. . . . .

Business loans—For the purposes of the act shall mean extensions of credit where the funds are to be utilized in a business enterprise and where the following conditions exist:

(i) The borrower exercises actual control over the managerial decisions of the enterprise in which the funds are to be utilized.

(ii) The borrower signs an affidavit under penalty of perjury setting forth the intended use of proceeds.

The requirements of §§ (i) and (ii) are conjunctive. *See East Coast Management, Inc. v. McLaughlin,* 533 F.Supp. 439, 441–42 (E.D.Pa.1982) (BECKER, J.). The record fails to contain evidence that the affidavit required by § (ii) *supra* was executed. *East Coast Management, Inc. v. McLaughlin,* 533 F.Supp. 439, 441–42 (E.D.Pa.1982) (BECKER, J.). However, we note that Bello, in his testimony, made reference to an affidavit executed by the Debtors which might have meant the affidavit in issue.

There is also a potential question as to whether the loan meets the § (i) requirement that the funds were "to be utilized in a business enterprise." The portion of the sums which were designated for use in Brutus' operation clearly would meet this definition, as did the entire loan at issue in *Jungkurth.* 74 B.R. at 331. However, there is some question as to whether the Debtors' use in refinancing the 900 Property constituted use in a "business enterprise." It would not be irrational for us to conclude that the use of funds for the 900 Property did meet this definition by "borrowing" the law surrounding the interpretation of 15 U.S.C. § 1603(1) of the TILA.

However, this exercise is unnecessary, because the interest rate limitation and oth-

er restrictions appearing in 41 P.S. § 301 apply only to "residential mortgages." As we noted at page 865 *supra,* Act 6 defines a "residential mortgage" (as opposed to "residential real property") as limited to obligations in which the principal amount is $50,000 or less. Unlike the *Jungkurth* obligation, the instant obligation does not meet this definition. Therefore, no provision of 41 P.S. § 301 could be applicable to the instant obligation, even if it were not considered to be a "business loan."

A similar observation negates the efforts of the Debtors to invoke the dicta in *First National Bank v. Flanagan,* 515 Pa. 263, 265, 528 A.2d 134, 135 (1987), which indicates that, irrespective of the inapplicability of the TILA to "business loans," the disclosures required by the TILA are required in all "residential mortgage" obligations in Pennsylvania pursuant to 41 P.S. § 401. The instant transaction does not fit the definition of a "residential mortgage" obligation. Therefore, the Debtors' invocation of 41 P.S. § 401 is misplaced.

The characterization of the instant transaction as a "business loan" has a broader effect than merely rendering the rather mild statutory penalties otherwise collectible under the TILA[4] or 41 P.S. § 401 inapplicable. It places the transaction outside of the scope of the several Pennsylvania laws regulating maximum interest rates and finance charges in consumer transactions. The remaining issue is whether the transaction is susceptible to no law except the "law of the jungle" and hence whether the apparent overreaching of the Debtors displayed by AAA in this transaction is beyond the grasp of the law to remedy.

4. THE CLAIMS OF AAA AGAINST THE DEBTORS ARE SUBJECT TO UDAP, AND ITS DEMANDS APPEAR SUSCEPTIBLE TO CERTAIN LIMITATIONS IN LIGHT OF ITS APPARENT OVERREACHING.

 Although we agree with AAA that the transaction in question was not a con-

---

**4.** The Debtors also invoke the much more drastic remedies for rescission set forth in such cases as, *e.g., In re Tucker,* 74 B.R. 923, 932–33 (Bankr.E.D.Pa.1987). However, the Debtors have failed to allege or prove that they ever dispatched a notice rescinding the transaction, as is required to make such a claim. *See* 15 U.S.C. § 1635(a).

sumer loan and that therefore the several Pennsylvania laws enacted to prevent overreaching in the consumer-loan context are inapplicable, we cannot agree with the implied further contention of AAA that business loan transactions must be treated by the courts with a *laissez faire* approach which permits any degree of overreaching.

The Debtors did not present a blemished prior credit record and they provided ample security for their loan. Nevertheless, AAA saw fit to charge them an interest rate of 19½%, 9% over prime. On top of this liberal charge for the cost of its money, AAA imposed $7,700 in "placement" and "acceptance" fees, and Bay helped itself to an additional fee of $12,000. A relatively small amount particularly blatant in its impropriety was the addition, by Attorney DeYoung, of a $1,250.00 fee for his "services" to the Debtors in the transaction. Attorney DeYoung, it will be recalled, was not only counsel to AAA, but is a part owner and landlord of AAA. Any fees charged by him or his firm to the Debtors, either for his participation in the initial loan transaction or for services performed in collection activities on behalf of AAA, would appear to be completely improper in light of his conflict of interest in purporting to represent both parties to the transaction. *See, e.g., Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951); *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); *In re Direct Satellite Communications, Inc.*, 96 B.R. 507, 523 (Bankr.E.D.Pa.1989); and *In re Greater Pottstown Community Church of the Evangelical Congregational Church*, 80 B.R. 706, 710–12 (Bankr.E.D.Pa.1987).

We recognize that, through some form of calculation which is as yet unexplained by AAA and which may constitute an attempt to utilize the same "one-half of the Rule of 78's" formula which we refused to approve in *Jungkurth*, 74 B.R. at 332–34, AAA's records indicate that the Debtors owe a net balance of $53,311.44. We are troubled by the prolixity of a transaction which is disclosed as a 15–year loan, but allows AAA to demand a balloon payment after three years. A demand for payment after three years would place the Debtors in the position of having to re-finance the transaction again after three years and renders the loan in issue as a sort of glorified "bridge loan." The terms of the loan make it, moreover, a bridge with a trap-door which allows AAA a ready means to seize the Debtors' property. We totally credit the Debtors' testimony that they did not understand the dynamics of the balloon-payment aspect of the loan, which is a trap for the unwary.

The mathematics of the transactions also raise questions about its fundamental fairness. In this regard, we offer some of our own calculations as a counter to AAA's claims. Assuming that a conscionable measure of the beginning loan balance was $120,000, our calculations indicate that an annual percentage rate of 19½% over 36 months would yield a total finance charge of $39,444.50. Against this gross sum of less than $160,000, the Debtors' payments of over $140,000 would leave a balance due of less than $20,000. Although payments were missed by the Debtor, the $77,525.59 payment made at the time of a seven-payment delinquency (about $15,600) was almost five times more than the delinquency and put them ahead in payments. Yet AAA claims the "net balance," even at the time of that payment, was over $54,000.

■ We are far more impressed by the unconscionability of the transaction as a whole than we are about the specific elements of damages asserted by the Debtors, *i.e.*, (1) loss of sale proceeds and capital gains tax liability of $41,500 as a result of the "forced sale" of the 900 Property; loss of $30,000 plus interest from the Debtors' savings accounts due to AAA's application of pressure to make payments; and "expenses, reasonable attorney fee and costs" incurred in maintaining this proceeding.

■ As we emphasized in *In re Repco Products Corp.*, 100 B.R. 184, 198 (Bankr. E.D.Pa.), *aff'd*, C.A. No. 89–5514 (E.D.Pa. Sept. 8, 1989), damages must be proximately caused by, and be reasonably foreseeable consequences as a result of, the defendants' conduct, and must be proven with at

least reasonable certainty by admissible evidence. We fail to see how the sale of the 900 Property at an allegedly-reduced price was a foreseeable consequence to AAA of its unspectacular collection tactics. We might have concluded differently had AAA known that the Debtors had been offered $125,000 for the property, and nevertheless actively threatened them with its sale if it were not liquidated immediately, even at a lower price. However, the Husband–Debtor testified to the contrary: the Debtors had not told AAA of the prospect of the $125,000 sale. We decline the Debtors' invitation to conclude that their self-induced panic-reactions to AAA's threats to sell the 900 Property can be attributed as an element of damages against AAA.

The difficulty in attributing the loss of the funds in the savings account and the liability for capital-gains tax in the sale of the 900 property to AAA is the failure of the Debtors to prove that these "damages" were proximately caused by AAA's conduct. *See Direct Satellite, supra,* 96 B.R. at 515–16, 519–22. The only evidence regarding the loss of the savings account is the Husband–Debtor's testimony that these amounts were withdrawn from the Debtors' respective accounts and utilized, apparently by the Wife–Debtor in the course of her doubtfully-competent stewardship as the Debtors' financial manager, to make payments for something. These funds may or may not have been paid on AAA's account. Since the account was in arrears until the sale of the 900 Property in December, 1987, whatever payments were made to AAA prior to that sale were clearly insufficient to meet the contract terms. It was not improper for AAA to expect and demand payment of the $2,230.17 monthly payments. Even our revisionist calculations of the Debtors' liability at pages 869–870 *supra* indicates a shortfall in payments until the sale of the 900 Property in December, 1987. We cannot conceive how AAA, irrespective of the overreaching displayed by it in the transaction, can be deemed liable because the Debtors were compelled to resort to savings to make payments due to them.

Equally mystifying is the claim that AAA is liable for the capital gains tax which the Debtors were compelled to pay upon the sale of the 900 Property. Like the Debtors' cashing of their savings accounts, the sale of the 900 Property by the Debtors was simply a necessary measure to make up their payment delinquencies. It was not improper for AAA to accept these proceeds for that purpose. If in fact the sale of the 900 Property had been for a higher price, as the Debtors apparently claim should have transpired, the capital gains tax arising from the sale would have increased, not decreased.

The claims for "expenses, reasonable attorney's fee and costs" are not in any sense quantified, and it is therefore difficult to comment upon them. We do note that 41 P.S. § 407(b) authorizes the Debtors to recover reasonable attorney's fees and costs attributable to their successful efforts "to remove [or] suspend ... a judgment entered by confession" in violation of 41 P.S. § 407(a). This provision would appear to render AAA and possibly Neumann liable for all reasonable attorney's fees and costs expended by the Debtors to set aside the sale of the Home from the inception of the efforts to do so until the time when the said Defendants agreed to set aside the sale, which was prior to the commencement of the lengthy trial of this proceeding. It would also appear to cover any fees and costs expended in defending any appeals from this aspect of this decision.

In addition, it appears that the Debtors might be able to recover any additional attorney's fees and costs incurred in prosecution of any successful UDAP claims. *See* page 873 *infra.* However, since our conclusion that the instant transaction was a "business loan" under Act 6 appears to eliminate any claims under 41 P.S. § 501, we doubt whether 41 P.S. §§ 503, 504 may serve as a basis for claims for attorney's fees. *But see Smith v. Kissell Co.,* 98 B.R. 708, 710 (E.D.Pa.1989) (an award of attorney's fees under § 503 is mandatory if any claim that excess interest has been charged under § 501 prevails).

We are also prepared to comment upon, if not decide, the Debtors' substantive claims that AAA violated the DPA and UDAP. The DPA is a provision of the Crimes Code which provides that "debt pooling," defined as follows in 18 Pa. C.S. § 7312(c), is a third-degree misdemeanor under 18 Pa. C.S. § 7312(a):

"Debt pooling." The making of a contract, express or implied, with a debtor or debtors whereby the debtor agrees to pay a sum of money periodically or otherwise to another person for the purpose of having such other person distribute the same among certain specified creditors in accordance with a plan agreed upon, or to be agreed upon, and whereby such other person shall receive a consideration for any such services rendered, or to be rendered, in connection therewith.

Due to the finding that "the business of debt adjusting is fraught with opportunities for defrauding debtors," many states have "enacted legislation prohibiting the business ... while others have taken steps to regulate it in an attempt to minimize fraud and protect the public from unscrupulous operations." Annot., *Legislation Regulating, Taxing, or Forbidding Business of Debt Adjusting*, 95 A.L.R.2d 1354, 1354–55 (1964). While an earlier version of such a law was declared unconstitutional by the Pennsylvania Superior Court, *Commonwealth v. Stone*, 191 Pa.Super. 117, 155 A.2d 453 (1959), the present version of the law, enacted in 1961 and recodified in 1972, has been applied by the same court in *Davis v. Safeguard Investment Co.*, 239 Pa.Super. 300, 361 A.2d 893 (1976), and by numerous lower courts without apparent doubt of its constitutionality. *See Baldwin v. Safeguard Investment Co.*, 10 Pa.D. & C.3d 505 (Allegheny Co., C.P.1977), *aff'd*, 259 Pa.Super. 590, 393 A.2d 1271 (1978); *TMF Systems, Inc. v. Equibank, N.A.*, 10 Pa.D. & C.3d 499, 502–03 (Allegheny Co. C.P.1979); and *Cooperman & Woods, Inc. v. Weikel*, 41 D. & C.2d 374 (Allegheny Co. C.P.1965). *See generally, Ferguson v. Skrupa*, 372 U.S. 726, 728–31, 83 S.Ct. 1028, 1030–32, 10 L.Ed.2d 93 (1963) (constitutionality of a comparable Kansas statutory scheme upheld, and the reasoning of *Stone* is expressly discredited).

Since the DPA is a penal provision, we have little doubt that it must be construed strictly in order that a purported wrongdoer may be clearly made aware that certain conduct is violative of the DPA. 1 Pa.C.S. § 1928(b)(1); and *Commonwealth v. Heinbaugh*, 467 Pa. 1, 5–6, 354 A.2d 244, 246 (1976). It can also be questioned whether violation of the DPA gives rise to a private action for civil penalties, as none are specifically provided for in the DPA. *See, e.g., Cort v. Ash*, 422 U.S. 66, 77–85, 95 S.Ct. 2080, 2087–91, 45 L.Ed.2d 26 (1975); and *Petition of H.C. Frick Coke Co.*, 352 Pa. 269, 273, 42 A.2d 532, 534 (1945).

AAA, suggesting a very literal reading of the DPA, argues that *it* is not subject to the DPA because *it* did not actually make any distributions to the Debtors' creditors. Rather, AAA argues that the actual distribution was effected by the title company which conducted the settlement.

AAA's suggestion that, if any party, the title company because it physically distributed the proceeds of the loan is the only potential "debt pooler" in the instant transaction is absurd. Clearly, the title company's activities were performed strictly in the capacity of an agent for AAA. Moreover, the facts of the small body of Pennsylvania cases construing the DPA appear to involve successful attempts by borrowers, situated quite similarly to the Debtors, to argue that violations of the DPA by their respective creditors should constitute a defense to the creditors' collection suits.

Thus, *Davis* involved a scenario in which the creditor provided a loan to pay off debts of the borrower totalling approximately $5,700.00. 239 Pa.Super. at 303, 361 A.2d at 895. The conscience of the court was shocked by the "exhorbitant [sic] fees for so-called 'financial consultation' and other undisclosed services" which totalled about $3,400 payable to the creditor and a loan broker and were heaped on to "normal" interest and costs. 239 Pa.Super. at 304, 303, 361 A.2d at 896, 895. The trial court's refusal to open a confessed judg-

ment entered by the creditor was therefore reversed because it appeared to the Superior Court that "the transaction involved in the instant case contains provisions violative of the Debt Pooling Act." 239 Pa.Super. at 304, 361 A.2d at 896.

In *Weikel*, the court struck a confessed judgment entered in favor of a creditor who charged a "service fee" of $590 in connection with negotiation of a $4,900 mortgage loan for the borrower. The *Weikel* court, like the court in *Davis*, was impressed that the parties' contract "authorizes plaintiff to pay the enumerated debts, including an exorbitant fee to themselves." 41 D. & C.2d at 377.

*Baldwin* involved a transaction in which a creditor provided proceeds to pay off loans of the borrower totalling about $13,-000 and imposed a service charge of $3,768.48. *Id.* at 513, 507. The court was, again, impressed by the magnitude of the creditor's charges for its services and refused to find

> a legal distinction, ... between a plaintiff who brings "money" to another for payment of creditors and a plaintiff who gives a first mortgage on real property to receive loan money for disbursement to creditors. In both instances the "pool" has been acquired from the assets of the debtor, and a charge is being made for the distribution of the debtor's own assets. *Id.* at 511.

The *Baldwin* court ultimately set aside a sheriff's sale based upon a confessed judgment obtained by the creditor, invalidated the judgment, and allowed the creditor to collect only the principal of about $13,000 from the borrowers. *Id.* at 529–30.

The facts of the instant transaction are similar to those in the aforesaid cases in several respects. In each case, a loan was made from the proceeds of which the respective debtors' outstanding debts were paid. Extremely high interest rates were charged. Very substantial charges were added by the creditor and the loan broker. Confessed judgments were entered against the respective borrowers, which the *Davis*, *Weikel*, and *Baldwin* courts all determined must be invalidated. If the transactions in

issue in *Davis* or *Baldwin* constitute "debt pooling," then it appears that the instant transaction could easily be so characterized.

We note that "debt poolers" seem particularly apt to use confession of judgment to enforce their rights, rather than spreading out the details of their overreaching on the record of an adversarial proceeding. The potential for obfuscation of the borrower's rights in the shadow of confession of judgment provides another of the illustrations why, as a matter of social policy, the use of confession of judgment should be severely restricted, if not eliminated. Its mere presence allows its use by that small minority of entities, apparently including AAA, which can be classified as "credit predators." The request for the thirty-six (36) blank checks at the commencement of the loan is another indicia of the presence of a "credit predator."

However, we believe that the Debtors' invocation of the catchall provision of UDAP, 73 P.S. § 201–2(4)(xvii), which prohibits fraudulent conduct which creates a likelihood of confusion or misunderstanding as a substantive basis for attacking AAA's unconscionable loan practices, is more appropriate than their invocation of the DPA. *See In re Smith*, 866 F.2d 576, 581 (3d Cir.1989); and *In re Milbourne*, 108 B.R. 522, 533–34 (Bankr.E.D. Pa.1989). UDAP applies to business transactions. *Jungkurth, supra,* 74 B.R. at 334–35, cited with approval in *Smith, supra,* 866 F.2d at 581, 582. A private right of action is expressly provided to aggrieved consumers under 73 P.S. § 201–9.2(a), and thus a private right of action is created in favor of parties aggrieved by actions in violation of statutes which, like the DPA, provide no remedies or only criminal penalties. *See In re Russell*, 72 B.R. 855, 871 (Bankr.E.D.Pa.1987). Even in a business transaction, UDAP violations will support a recoupment against a creditor's claim, if not a claim for treble damages. *Jungkurth*, 74 B.R. at 335–36. As a remedial statute rather than a penal provision, *Russell, supra,* 72 B.R. at 871; and *Commonwealth v. Monumental Properties, Inc.*,

459 Pa. 450, 457–78, 329 A.2d 812, 815–26 (1974), UDAP is susceptible to as broad an interpretation as is necessary to serve its purpose of preventing any form of fraud or overreaching. It is a weapon which has been crafted especially for the purpose of curbing the creditor-predator-like behavior which we find pervades the conduct of AAA in the instant transaction. We also observe that 201–9.2(a) of UDAP is a fertile basis upon which the Debtors may assert their claims for reasonable attorney's fees and costs. *See In re Andrews, supra,* 78 B.R. 78, 85 (Bankr.E.D.Pa.1987); *Jungkurth, supra,* 74 B.R. at 336 (affirmed by the district court); and *Russell, supra,* 72 B.R. at 873.

We therefore conclude that UDAP is a more appropriate medium by which the Debtors can reduce AAA's claim to its just measure than is the DPA. However, we do allow that the cases interpreting the DPA which are cited and discussed at pages 871–72 *supra,* present persuasive authority for the principle that the terms of the instant transaction are unconscionable and are subject to court adjustment.

## E. CONCLUSION

Having provided all of the guidance at this juncture which we can as to the ultimate outcome of the determination of the claims of AAA and possibly Neumann, we will proceed to enter an Order, similar to that entered by us in *Orsa I, supra,* 99 B.R. at 624; *Cole, supra,* 81 B.R. at 338–39; and *Corbett, supra,* 80 B.R. at 38, setting aside the sheriff's sale of the Home, but relegating final disposition of the claims of the parties affected by this Order to a supplemental claims process.

## ORDER

AND NOW, this 5th day of April, 1990, after conducting a trial of the above-entitled proceeding on November 7 and 17, 1989, and upon careful consideration of the Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs submitted by the respective parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Debtors, ROBERT P. FRICKER and DOLORES A. FRICKER, and against the Defendants. The Sheriff's sale of April 19, 1989, of the Debtors' home situated at 936 Welsh Road, Huntingdon Valley, Pennsylvania, and the confessed judgment entered in Case No. 87–12853 in the Montgomery County Court of Common Pleas on September 2, 1987, are declared to be void and of no legal effect and shall be stricken.

2. On or before April 20, 1990, Defendants ACCEPTANCE ASSOCIATES OF AMERICA, INC., HERMAN NEUMANN, and FRANK P. LALLEY, in his capacity as Sheriff of Montgomery County, shall take all steps necessary to effectuate paragraph one of this decision.

3. On or before April 20, 1990, Defendants ACCEPTANCE ASSOCIATES OF AMERICA, INC. and HERMAN NEUMANN, or the Debtors on their behalf, may file and serve upon the Debtors and the court in chambers, any Proofs of Claim or Amended Proofs of Claim setting forth any Claims which they have against the Debtors.

4. The Debtors shall file and serve upon the claimant and the court in chambers, any Objections to any of the aforesaid Proofs of Claim or Amended Proofs of Claim filed pursuant to paragraph three hereof on or before April 30, 1990.

5. The Confirmation Hearing presently scheduled on May 8, 1990, shall be held at the same time as the hearing on any Objections to the Proofs of Claim or Amended Proofs of Claim filed pursuant to paragraph four hereof on

TUESDAY, MAY 8, 1990, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. In light of the long pendency of this case, no continuances of the dates set forth in this Order will be entertained.